MELODY HOME MANUFACTURING
COMPANY, Petitioner,

v.

Lonnie BARNES et ux., Respondents. °

No. C–5508.

Supreme Court of Texas.

Nov. 4, 1987.

not connected to the drain in one of the interior walls.

The continual leak caused severe damage to the home's sheetrock, insulation, and flooring. The Barneses told Melody Home about the problem. Workmen from Melody Home came out twice, but their efforts were unsatisfactory, and additional damages were caused by the repair. The workmen cut and tore linoleum while attempting to repair the home. Moreover, they failed to reconnect the washing machine drain, causing the house to flood with resulting damage to the floors, cabinets, and carpeting.

The Barneses then filed this DTPA implied warranty suit against Melody Home. The jury found that Melody Home failed to construct the home in a good and workmanlike manner. The jury further found that Melody Home breached its implied warranty to repair in a good and workmanlike manner and that this breach was knowing. Based on its finding that Melody Home knowingly breached the implied warranty, the jury awarded $5,000 in discretionary damages under Tex.Bus. & Com. Code Ann. § 17.50(b)(1) (Vernon Supp. 1987).

Melody Home appealed the award of DTPA discretionary damages. The court of appeals held that the sale of a service carries with it the implied warranty that the service will be performed in a skillful and workmanlike manner and affirmed the judgment of the trial court.

■ Melody Home first challenges the Barneses' status as consumers with regard to the repairs. DTPA plaintiffs must qualify as consumers, as that term is defined in Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon Supp.1987),[1] to maintain a private cause of action under section 17.50 of the Act. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 706 (Tex.1983). We have recognized at least two requirements to establish DTPA consumer status. First, the plaintiffs must have sought or acquired goods or services by purchase or

M. Ward Bailey, M. Ward Bailey & Associates, P.C., Fort Worth, for petitioner.

Timothy G. Chovanec, Priddy & Chovanec, Fort Worth, Joe K. Longley, Mark L. Kincaid, Longley & Maxwell, Austin, for respondents.

ON MOTION FOR REHEARING

SPEARS, Justice.

The court's opinion of June 17, 1987 is withdrawn and the following is substituted therefor.

This is a Deceptive Trade Practices–Consumer Protection Act (DTPA) implied warranty case. Lonnie and Donna Barnes sued Melody Home Manufacturing Company under the DTPA for breach of an implied warranty that repairs would be done in a good and workmanlike manner and for other DTPA violations. The jury found that Melody Home knowingly breached this implied warranty and awarded discretionary damages. The trial court rendered judgment for the Barneses and the court of appeals affirmed the judgment of the trial court. 708 S.W.2d 600. We affirm the judgment of the court of appeals.

In 1979, the Barneses ordered a modular pre-fabricated home from Melody Home. Their home was delivered in May 1980. After the Barneses moved in, they continually experienced puddles and dampness inside the house. Over two years after moving in, they discovered that a sink was

---

1. Section 17.45(4) provides in pertinent part: " 'Consumer' means an individual ... who seeks or acquires by purchase or lease, any goods or services...."

lease. *Sherman Simon Enter., Inc. v. Lorac Service Corp.*, 724 S.W.2d 13, 15 (Tex. 1987); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981). Second, the goods or services purchased or leased must form the basis of the complaint. *Sherman Simon Enter., Inc.*, 724 S.W.2d at 15; *Cameron*, 618 S.W.2d at 539.

■ It is uncontroverted that the Barneses purchased goods and thus were "consumers" when they originally bought the home. Melody Home's attempts to repair the defects in the home were, by definition, "services" under the DTPA. Section 17.45(2) defines "services" as "work, labor or service purchased ... for use including services furnished in connection with the sale or *repair* of goods." (emphasis added). Melody Home argues that the Barneses were not "consumers" with regard to the repair services because they did not purchase them with cash. *See, e.g., Exxon Corp. v. Dunn*, 581 S.W.2d 500 (Tex.Civ.App.—Dallas 1979, no writ). The absence of a cash transfer is not determinative because DTPA plaintiffs establish their standing as consumers in terms of their relationship to a transaction, not by their contractual relationship with the defendant. *Flenniken*, 661 S.W.2d at 707. The question then is whether the Barneses "purchased" the repair services within the meaning of the Act.

■ In *Humber v. Morton*, 426 S.W.2d 554 (Tex.1968), this court held that a builder/vendor impliedly warrants to a purchaser that a building constructed for residential use has been constructed in a good and workmanlike manner and is suitable for human habitation. *Evans v. J. Stiles, Inc.*, 689 S.W.2d 399, 400 (Tex.1985). When the Barneses discovered the defect in their home, they had the option to immediately sue for money damages or give Melody Home the opportunity to cure the problem. The parties' choices to allow and make repairs relate back to the original purchase and were a continuation of that transaction.

The Barneses did not lose their consumer status by allowing Melody Home to attempt to correct the problem and by deferring their lawsuit. Under Melody Home's argument the Barneses would be penalized by losing their consumer status because they allowed repairs. The law encourages dispute resolution prior to litigation. *See* Tex.Bus. & Com.Code Ann. § 17.50A (Vernon Supp.1987). Accordingly we hold that the Barneses "purchased" the repair services.

■ Melody Home next contends that repair services do not carry with them an implied warranty that they will be performed in a good and workmanlike manner. Implied warranties are created by operation of law and are grounded more in tort than in contract. *La Sara Grain v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex.1984); *Humber*, 426 S.W.2d at 556. A number of courts of appeals decisions have expressly or impliedly recognized such an implied warranty.[2] In addition, several articles, comments, and notes have concluded that the doctrine of implied warranty should apply to services.[3] De-

**2.** *See Thrall v. Renno*, 695 S.W.2d 84, 87 (Tex. App.—San Antonio, 1985, writ ref'd n.r.e.) (brick patio construction); *Diversified Human Resources Group, Inc. v. PB–KBB, Inc.*, 671 S.W.2d 634, 636 (Texas App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (employee furnishing); *Griffin v. Eakin*, 656 S.W.2d 187, 190 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (book printing); *Holifield v. Coronado Bldg. Inc.*, 594 S.W.2d 214, 215 (Tex.App.—Houston [14th Dist.] 1980, no writ) (house repair); *Import Motors Inc. v. Matthews*, 557 S.W.2d 807, 809 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.) (car repair); *Boman v. Woodmansee*, 554 S.W.2d 33, 34 (Tex.Civ.App.—Austin 1977, no writ) (swimming pool installation); *Trends, Inc. v. Stafford–Lowdon Co.*, 537 S.W.2d 778, 782 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.) (printing); *Mercedes Dusting Services, Inc. v. Evans*, 353 S.W.2d 894, 896 (Tex.Civ.App.—San Antonio 1962, no writ) (airplane repair).

**3.** *See* D. Bragg, P. Maxwell, J. Longley, *Texas Consumer Litigation* § 5.04 (2d ed. 1983); Greenfield, *Consumer Protection in Service Transactions—Implied Warranties and Strict Liability in Tort*, 1974 Utah L.Rev. 661 (1974); Norman, *Consumer Service Transactions, Implied Warranties and a Mandate for Realistic Reform*, 11 Loy.U.Chi.L.J. 405 (1980); Singal, *Extending Implied Warranties Beyond Goods: Equal Protection for Consumers of Services*, 12 New Eng. 859 (1977); Comment, *Expansion of Implied Warranty Coverage Under the DTPA:*

spite its importance, this court has never ruled on this issue. *But see Dennis v. Allison,* 698 S.W.2d 94, 96 (Tex.1985) (Ray, J., dissenting).

■ An implied warranty arises by operation of law when public policy so mandates. *Dennis v. Allison,* 698 S.W.2d at 95; *Jacob E. Decker & Sons, Inc. v. Capps,* 139 Tex. 609, 164 S.W.2d 828, 829 (1942). Unlike the situations in *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W. 2d 77, 78 (1977) and *La Sara Grain,* 673 S.W.2d at 565, consumers of services do not have the protection of a statutory or common law implied warranty scheme. The issue presented in this case is whether the protection of Texas consumers requires the utilization of an implied warranty that repair services of existing tangible goods or property will be performed in a good and workmanlike manner as a matter of public policy. *Nobility Homes of Texas, Inc.,* 557 S.W.2d at 78.

During the last thirty-five years, the United States has shifted from a goods to a services oriented economy.[4] With this change has come a marked decrease in the quality of services.[5] Similar quality control problems and consumer protection interests led this court and the legislature to apply the theory of implied warranty to

products, goods, and new houses. *See Humber,* 426 S.W.2d at 562; *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 789 (Tex.1967); *Jacob E. Decker & Sons,* 164 S.W.2d at 832; *see also* Tex.Bus. & Com. Code Ann. § 2.314 (Vernon 1968).

Just as with products, an examination of several strict liability policies favors the extension of the theory of implied warranty to service transactions. *See* Greenfield, 1974 Utah L.Rev. at 688–691; Prosser, *The Assault Upon the Citadel,* 69 Yale L.J. 1099, 1120–24 (1960); Comment, 17 Tex. Tech.L.Rev. at 938–42. First, the public interest in protecting consumers from inferior services is paramount to any monetary damages imposed upon sellers who breach an implied warranty. Second, a service provider is in a much better position to prevent loss than is the consumer of the service. Many services are so complicated and individually tailored that a consumer is unable to independently determine quality and must depend on the experience, skill, and expertise of the service provider.[6] Third, a consumer should be able to rely upon the expertise of the service provider. The application of implied warranty to services would encourage justifiable reliance on the service providers who would have more incentive to increase and maintain the

*Service Contracts,* 17 Tex.Tech L.Rev. 917 (1986); Comment, *Guidelines for Extending Implied Warranties to Service Markets,* 125 U.Pa.L. Rev. 365 (1976); Note, *The Application of Implied Warranties to Predominantly "Service" Transactions,* 31 Ohio St.L.J. 580 (1970); Note, *Continuing the Common Law Response to the New Industrial State: The Extension of Enterprise Liability to Consumer Services,* 22 U.C.L.A. L.Rev. 401 (1974). *But see,* Sales, *The Service-Sales Transaction: A Citadel Under Assault,* 10 St. Mary's L.J. 13 (1978); Note, *Breach of Implied Warranty Under DTPA as Applied to Service Contracts: Diversified Human Resources Group, Inc. v. PB–KBB, Inc.,* 37 Baylor L.Rev. 549 (1985).

**4.**

Percentage of Gross National Product
by Major Type of Product

| YEAR | SERVICES | GOODS | STRUCTURES |
|------|----------|-------|------------|
| 1950 | 30.9 | 56.6 | 12.5 |
| 1960 | 38.2 | 50.1 | 11.7 |
| 1970 | 43.3 | 46.3 | 10.4 |
| 1980 | 46.5 | 43.3 | 10.2 |
| 1984 | 48.1 | 42.1 | 9.8 |

Commerce Dept., *Statistical Abstract of the United States* 431 (106th ed. 1986). *See generally,* K. Albrecht & R. Zemke, *Service America! Doing Business in the New Economy* (1985).

The service GNP percentage has been estimated as high as 68% by some economists. *See* Quinn and Gagnon, *Will Services Follow Manufacturing into Decline?,* Harvard Bus.Rev., Nov.–Dec. 1986 at 95. In fact, of the 12.6 million new jobs created since 1982, almost 85% have been in service industries as opposed to goods-producing fields. Koepp, *Pul-eeze! Will Somebody Help Me?,* Time, February 2, 1987 at 50.

**5.** *See generally* Koepp at 48; Main, *Toward Service Without a Snarl,* Fortune, March 23, 1981 at 58; Quinn & Gagnon at 103; Tuchman, *The Decline of Quality,* New York Times Magazine, November 2, 1980 at 38.

**6.** "This is a question of consumer. Of helpless consumer. Of consumer who takes what he gets, because he does not know enough technically, to test even what is before his eyes." Llewellyn, *On Warranty of Quality and Society: II,* 37 Colum.L.Rev. 341, 404 (1937).

quality of the services they provide. Fourth, a service provider is better able to absorb the cost of damages associated with inferior services through insurance and price manipulation than is the individual consumer.

As Justice Norvell wrote in *Humber:*

That Court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance on the old rule.

426 S.W.2d at 561–62, *quoting* Cardozo, *The Nature of the Judicial Process* at 151 (1971). The caveat emptor rule as applied to services such as repairs is an anachronism patently out of harmony with modern service buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by encouraging the purveyor of shoddy workmanship. *Id.* at 562.

█ We hold that an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner is available to consumers suing under the DTPA. The legislative history of the DTPA indicates that the Act was intended to apply to all service providers.[7] *See* H.J. of Tex., 63rd Leg., Reg. Sess. 2114–15 (1973) (rejecting proposals to amend DTPA to exempt insurance agents and brokers and licensed professionals from coverage of Act); Maxwell, *Public and Private*

*Rights and Remedies Under the Deceptive Trade Practices–Consumer Protection Act,* 8 St. Mary's L.J. 617, 640–41 (1977) (discussing the legislature's refusal to exempt services from the coverage of the DTPA).

This case does not involve the laundry list of false misleading or deceptive acts or practices made actionable by section 17.-50(a)(1) of the DTPA. Instead, this case presents the question whether an implied warranty applies to repair or modification services of existing tangible goods or property. The question whether an implied warranty applies to services in which the essence of the transaction is the exercise of professional judgment by the service provider is not before us. *Cf. DeBakey v. Staggs,* 612 S.W.2d 924 (Tex.1981) (attorney's clients suing under the DTPA for attorney's "unconscionable" actions are "consumers"). *But see Dennis v. Allison,* 698 S.W.2d 94 (Tex.1985) (implied warranty not available to doctor's patient injured by improper treatment).

█ We define good and workmanlike as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work. *See Griffin v. Eakin,* 656 S.W.2d 187, 190–91 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Burnett & Bean v. Miller,* 205 Ala. 606, 88 So. 871, 872 (1921). *Cf. Garcia v. Color Tile Distrib. Co.,* 75 N.M. 570, 408 P.2d 145, 148 (1965); *Fairbanks, Morse & Co. v. Miller,* 80 Okl. 265, 195 P. 1083, 1090

---

**7.** At the time of the enactment of the DTPA in 1973, Chief Justice John Hill, then Attorney General, testified before the House Committee on Business and Industry that the DTPA was intended to apply to all services:

CHAIRMAN: Are there any questions for General Hill? The Chair recognizes Mr. Heatly.

HEATLY: General, this bill, when you said it did not leave anyone out, in other words, this takes in the oil and gas industry, the insurance industry—the reason I'm naming these first, is that I'm going by the largest ones first, the refrigerators, the stove, the automobile, I mean it's a Mother Hubbard, it takes them all?

HILL: It deals with any firm or individual who is engaged in a deceptive trade practice as defined by the bill. So the answer to the question would be, yes, at any level or from any source.

The Deceptive Trade Practices—Consumer Protection Act: Hearings on Tex.H.B. 417 Before the House Committee on Business and Industry, 63rd Leg. 17 (Feb. 27, 1973).

In 1977, Attorney General Hill again noted that a significant aspect of the DTPA was the repeal of prior exemptions. Hill, *Consumer Protection Symposium: Introduction,* 8 St. Mary's L.J. 609, 613 (1977).

(1921). We do not require repairmen to guarantee the *results* of their work; we only require those who repair or modify existing tangible goods or property to *perform* those services in a good and workmanlike manner.[8]

▆▆▆ In this case, the breach of the implied warranty was plainly within the common knowledge of laymen and did not require expert testimony. The jurors had sufficient knowledge to find that the failure to connect a washing machine drain would not be considered good and workmanlike by those capable of judging repair work.

▆▆▆ Consistent with the trend in recent consumer protection legislation and sound public policy, we further hold that the implied warranty that repair or modification services of existing tangible goods or property will be performed in a good and workmanlike manner may not be waived or disclaimed. *See e.g.* Tex.Bus. & Com. Code Ann. § 17.42 (Vernon Supp.1987) (DTPA waiver unenforceable and void); Tex.Rev. Civ.Stat.Ann. art. 5221f, § 18 (Vernon Supp.1987) (waiver of the provisions of the Manufactured Housing Standards Act unenforceable and void). It would be incongruous if public policy required the creation of an implied warranty, yet allowed the warranty to be disclaimed and its protection eliminated merely by a pre-printed standard form disclaimer or an unintelligible merger clause. *See G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392, 394–95 (Tex. 1982) (Spears, J., dissenting).

When disclaimers are permitted, adhesion contracts—standardized contract forms offered to consumers of goods and services on an essentially "take it or leave it" basis which limit the duties and liabilities of the stronger party—become com-

monplace. *See, e.g., King v. Larsen Realty, Inc.*, 121 Cal.App.3d 349, 175 Cal.Rptr. 226, 231 (1981); *Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 133 Cal.Rptr. 775, 783 (1976); *Star Finance Corp. v. McGee*, 27 Ill.App.3d 421, 326 N.E.2d 518, 522 (1975); *Cushman v. Frankel*, 111 Mich.App. 604, 314 N.W.2d 705, 707 (1981); *Guthmann v. La Vida Llena*, 103 N.M. 506, 709 P.2d 675, 678 (1985). The consumer continues to expect that the service will be performed in a good and workmanlike manner regardless of the small print in the contract. A disclaimer allows the service provider to circumvent this expectation and encourages shoddy workmanship. To the extent that it conflicts with this opinion, we overrule *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392.

The final issue is whether the jury's finding that Melody Home committed a *knowing* breach of this implied warranty justifies the award of discretionary damages under the DTPA. Section 17.50(a) of the DTPA provides that: "A consumer may maintain an action where any of the following constitute a producing cause of actual damages: ... (2) breach of an express or implied warranty." The DTPA does not define the term "warranty" nor does it create any warranties. *La Sara Grain*, 673 S.W.2d at 565.

▆▆▆ The DTPA should be liberally construed and applied to promote its underlying purposes—protecting consumers against breaches of warranty and providing efficient economical procedures to secure such protection.[9] Tex.Bus. & Com. Code Ann. § 17.44 (Vernon Supp.1987). As mentioned earlier, section 17.45(2) expresses the legislative intent that providers of services should not escape the requirements of the Act. Allowing consumers to sue under section 17.50(a) for breach of an

---

**8.** The Gonzalez concurring opinion, in its zeal, blindly overlooks the essence of the court's holding. In strict liability cases, the focus is on the *product* and not on the conduct of the producer. By contrast, the inquiry in a breach of warranty case concerns the *performance* of the service provider.

**9.** A DTPA actionable implied warranty will further the policy of giving consumers an efficient

and economical means of securing protection from poor quality services. Often, the monetary damages involved with inferior repair services do not justify the costs of suit under the traditional theories of negligence or breach of contract. Under the DTPA, a prevailing plaintiff may recover attorneys' fees and discretionary damages. Tex.Bus. & Com.Code Ann. § 17.50 (Vernon Supp. 1987).

implied warranty that repair services will be done in a good and workmanlike manner is a logical, consistent, and intended interpretation of the Act. *See* Comment, 17 Tex. Tech L.Rev. at 934–36. Therefore it follows that the breach of an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner is actionable under section 17.-50(a)(2) of the DTPA.

We overrule all of Melody Home's points of error and affirm the judgment of the court of appeals.

CAMPBELL, J., files a concurring opinion in which WALLACE, J., joins.

GONZALEZ, J., files a concurring opinion in which HILL, C.J., joins.

CAMPBELL, Justice, concurring.

I agree with the result reached by the Court in this cause. However, the remedy created by the majority goes far beyond that which is required by the facts of this case and the arguments submitted by Barnes. I am not prepared to hold, under the guise of public policy, that *all* service providers will be strictly liable for breach of an implied warranty to render services in a good and workmanlike manner. Our holding should only extend to the manufacturer of a product who purports to remedy a defect that existed at the time the product was sold to the consumer.

Because I oppose the creation of an implied warranty applicable to all services, I am also necessarily opposed to the dicta in the Court's opinion which purports to disallow parties to disclaim liability under such an all-encompassing implied warranty. This is not raised by point of error and is not in this case. I would not impair the rights of parties to contract.

1. The issue of whether a party can waive or disclaim the implied warranty of habitability is not before us. It was not preserved for review. The court has violated our own rules and given an advisory opinion. Nonetheless, if the court feels compelled to write on this issue, my preference is that we not deny parties the right to contract but require that the waiver or disclaimer be in clear and unequivocal language in or-

My concurring opinion dated June 17, 1987 is withdrawn.

WALLACE, J., joins in this concurring opinion.

GONZALEZ, Justice, concurring.

My concurring opinion of June 17, 1987 is withdrawn and the following is substituted.

I concur with the court's judgment, but the creation of a new implied warranty is unnecessary, confusing and ill advised. I agree with the court's conclusion that Melody breached an implied warranty actionable under the Deceptive Trade Practices Act. Tex.Bus. & Com. Code Ann. §§ 17.-41–17.63 (Vernon Supp.1987). However, I would hold that the warranty arises only as a limited extension of the *Humber* warranty that a builder/vendor will construct a home in a good and workmanlike manner. *Humber v. Morton*, 426 S.W.2d 554 (Tex. 1968).

Who would have thought when writ was granted that the court would use this cause to create a new warranty and to overrule *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392 (Tex.1982). I did not and neither did the Barneses, who asked us only to hold that the *Humber* warranty applied to the repair efforts of a builder/vendor such as Melody. The majority opinion is unrecognizable from the case that was argued and briefed.[1]

The court does not write on a clean slate when it creates an implied warranty, applicable to providers of repair services of tangible goods or property actionable under the DTPA. We are not free to create substantive rights by rewriting a statute under the guise of interpretation. Yet, the court's uninvited imposition of an implied warranty upon all repair service transactions does just that by extending the scope of the DTPA far beyond its intended bounds.[2] The majority's action constitutes

der for it to be effective. See *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392, 394–95 (Tex.1982) (Spears, J. dissenting).

2. House Bill 417, the source of the DTPA, was drafted by the attorney general's office and reflected the input of both consumer advocates and representatives of business and industry. Discussions in committee hearings by both pro-

an improper excursion into the legislative arena. *See Seay v. Hall,* 677 S.W.2d 19, 25 (Tex.1984); *Ex Parte Salter,* 452 S.W.2d 711 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd).

## BACKGROUND

In order to underscore my disagreement with the court's opinion it is necessary that I set out in more detail the findings of the jury and the judgment of the trial court. As acknowledged by this court, the Barneses alleged two theories of recovery against Melody Home: (1) breach of the implied warranty that the house was constructed in a good and workmanlike manner, *Humber v. Morton,* 426 S.W.2d at 554,[3] and (2) breach of the implied warranty to repair the house in a good and workmanlike manner (the service warranty).[4] The jury found Melody Home in breach of both warranties and awarded damages as follows:

A. Failure to manufacture the modular home in a good and workmanlike manner;

Answer: $100

B. Failure to repair the modular home in a good and workmanlike manner;

Answer: $3,000

The jury further found that the breach of the service warranty was done knowingly, but that the breach of the *Humber* warranty was not. Conditioned upon the finding that the service warranty was knowingly breached, the jury awarded discretionary DTPA damages of $5,000. The jury also found that the Barneses had not failed to give Melody Home a reasonable opportunity to repair the defects and determined the Barneses' reasonable attorney's fees.

ponents and opponents of the bill make it clear that the warranty provisions of the DTPA were aimed chiefly at breaches of the statutory implied warranties of merchantability and fitness for a particular purpose. Tex.Bus. & Com.Code Ann. §§ 2.314, 2.315 (Vernon 1968). *See The Texas Deceptive Trade Practices—Consumer Protection Act: Hearings of Tex.H.B. 417 Before the House Comm. on Bus. & Indus. and Subcommittee,* 63d Leg. (Feb. 27 and Mar. 28, 1973) (tapes available at House Committee Coordinator's office).

Based on these findings, the trial court rendered judgment awarding the following sums to the Barneses:

(A) $3,100 in actual damages;

(B) $2,000 in accordance with the provisions of § 17.50(b)(1) of the Texas Business and Commerce Code which provides for automatic doubling of plaintiff's first $1000 in actual damages;

(C) $5,000 in accordance with the provisions of § 17.50(b)(1) of the Texas Business Code (sic) which are discretionary damages within the discretion of the jury when a deceptive trade practice is found to have been knowingly committed;

(D)–(G) ... (reasonable attorney's fees for trial and appeal).

From the jury findings it is evident that the punitive DTPA damages of $2000 in paragraph (B) of the judgment are premised on the breach of the service warranty and that the discretionary DTPA damages of $5000 in paragraph (C) of the judgment are premised on the *knowing* violation of the service warranty.

## POLICY ANALYSIS

Even if this court were free to extend the DTPA as the court has done, there are other reasons for my disagreement with the majority opinion. We have heard no public outcry indicating that services consumers' existing remedies are inadequate. No showing is made that the Legislature has been requested to amend the DTPA to provide a cause of action for breach of such an implied warranty applicable generally to service providers. The majority cites no authority that convinces me that any other public policy requires that we create a new cause of action under the DTPA premised on breach of an implied warranty.[5]

3. This warranty was in existence when the DTPA was passed and was subject to its remedies.

4. This warranty was unknown to Texas law when this lawsuit was filed.

5. In order to bolster its opinion that a great social problem exists that cries out to be remedied by the imposition of strict tort liability to service providers, the court says: "With this change (from a goods to a service oriented econ-

The court's opinion is especially disturbing in light of the fact that we so recently refused to create an implied warranty for professional service transactions. *Dennis v. Allison*, 698 S.W.2d 94 (Tex.1985).[6] Under much more compelling facts than are present here, we concluded that the creation of an implied warranty was unnecessary because the plaintiff already possessed adequate remedies to redress the wrong.[7] How is the present case any different? I would follow the reasoning of this court in *Dennis v. Allison* and decline to create an implied warranty for repair services. What has happened in the few months since *Dennis v. Allison* to alter our reasoning? How can there be any semblance of predictability and stability in our law with such sudden and abrupt changes in the writings of our highest court for civil matters?

Instead of extending *Humber*, the court elects to create a new implied warranty applicable to repair services. This is done on the basis of public policy and not as the logical extension of existing case law.

Although the court lists a number of cases in footnote 2 which purport to recognize an implied warranty that repair services be rendered in a good and workmanlike manner, it is important to recognize that the present opinion, *actually judicially creates* the implied warranty which it uses

to serve as a catalyst for DTPA damages. The cases listed by the majority in footnote 2 simply serve to illustrate that the term "implied warranty" has no fixed legal meaning at common law.[8]

## EXISTING REMEDIES

The tenor of the court's policy discussion, is that the purchaser of services lacks a remedy for substandard performance. Such a suggestion is unfounded because the service consumer has a choice of remedies for substandard performance under both contract and tort. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947). The implied duty of good and workmanlike performance has been applied under contract principles as an affirmative defense (failure of consideration) or offensively under negligence principles to collect damages proximately caused by unskillful and deficient work. *See Compton v. Polonski*, 567 S.W.2d 835 (Tex.Civ.App.—Corpus Christi 1978, no writ); *New Trends, Inc. v. Stafford–Lowdon Co.*, 537 S.W.2d 778 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.); *Westbrook v. Watts*, 268 S.W.2d 694 (Tex.Civ. App.—Waco 1954, writ ref'd n.r.e.). Moreover, providers of services are already subject to suit under the "laundry list" of deceptive acts contained in section 17.46 of the DTPA. *See, e.g.,* Tex.Bus. & Com.Code

omy) has come a marked decrease in the quality of services. Similar control problems and consumer protection interests led this court and the legislature to apply the theory of implied warranty to products, goods and new houses." 741 S.W.2d 353. The "authority" to prove these "legislative facts" is found in footnote 5 which are three magazine articles in Time, Fortune and New York Times. These articles do not cite empirical studies that can withstand critical scrutiny as to their validity. *See generally* Walker & Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 Va.L.Rev. 559 (1987).

6. Dennis sued her psychiatrist (Allison) under a theory of breach of implied warranty to follow the ethical commandments for psychiatrists. He beat and raped her. The jury found in her favor and awarded money damages. The trial court disregarded the jury answers and rendered judgment for Allison. The court of appeals affirmed the judgment of the trial court. We affirmed.

7. The court concludes its discussion of fundamentals normally associated with strict liability in tort, with the statement ... "The caveat emptor rule as applied to services such as repairs is an anachronism patently out of harmony with modern service buying practices." 741 S.W.2d 353–54, I agree. This doctrine has been dead in Texas for quite some time. See: *Humber v. Morton*, 426 S.W.2d at 558.

8. As Professor Williston observed, the word warranty "illustrates as well as any other the fault of the common law in the ambiguous use of terms." 5 S. Williston, *A Treatise on the Law of Contracts*, § 673 (3d ed. 1961). Professor Llewellyn, father of the Uniform Commercial Code, perhaps said it best when he wrote: "To say warranty is to say nothing definite as to legal effect." K. Llewellyn, *Cases and Materials on the Law of Sales* at 211 (1930).

Ann. § 17.46(b)(5) (Vernon Supp. 1987) (representing that services have characteristics or benefits which they do not have); § 17.46(b)(7) (representing that services are of a particular standard, quality or grade, if they are of another); § 17.46(b)(21) (representing that services have been performed that have not been performed). In a contract action, the consumer can recover attorney fees under Chapter 38 of the Civil Practice and Remedies Code. Tex.Civ. Prac. & Rem.Code Ann. §§ 38.001–38.006 (Vernon 1987). Before the court concludes the additional remedies provided by an implied warranty under the DTPA are necessary to protect any Texas consumer, more evidence of such need should be forthcoming than is presented here.

The question posed by the court is who should bear the loss. This question answers itself. Obviously, if the service provider has negligently performed his job, he should respond in damages. The real question is not should we compensate the injured plaintiff, but how much should we punish the service provider. In egregious cases, exemplary damages are already available for grossly negligent conduct. I see no compelling policy reason based in this record for subjecting negligent providers of service who do not engage in deception to the statutory penalties prescribed by the DTPA as a matter of law.

*Limits—New Warranty*

My next concern is with what constitutes a breach of the implied service warranty and how such a breach is to be proven. The court writes that a service provider impliedly warrants that services will be performed in a good and workmanlike manner which means a manner generally considered proficient by those capable of judging such work. Expert testimony is necessary "unless the nature of the breach of this implied warranty is plainly within the common knowledge of laymen." 741 S.W. 2d 355.

The facts in this case serve to show how broadly this implied warranty will be ap-

plied in the future. The original defect in the modular home consisted of Melody Home's failure to properly connect the sink to a drainpipe hidden from view by a wall. The jury found that this defect caused $100.00 in damages. The Barnes informed Melody Home of the defect and the resulting damage that it had caused. Melody Home workmen came out twice to repair the damage, but succeeded only in making matters worse. The repair efforts were so inept that the jury found them to be the cause of $3,000.00 in damages to the Barneses.

Examining the court's opinion for the precise damage caused by Melody Home, I find "that additional damages were caused by the repair," "workmen cut and tore linoleum," and "failed to reconnect the washing machine drain, causing the house to flood with resulting damage to the floors, cabinets and carpeting." Later in the opinion when discussing the potential need for expert testimony to prove a breach of the service warranty, the court concludes that none was necessary in this case because "the jurors had sufficient knowledge to find that the failure to connect a washing machine drain would not be considered good and workmanlike by those capable of judging repair work." 741 S.W.2d 355.[9]

This assumes that the washing machine "flood" was the producing cause of all damages and that reconnecting the washing machine was a task within Melody Home's implied warranty. Melody Home, however, did not come to the Barnes' home to install a washing machine. Melody Home sent workmen to repair the water damage to flooring, drywall and trim caused by the original defect. In attempting these repairs, it was necessary to move the washing machine. I agree that Melody Home was negligent in not reconnecting the washer's drain but, does the court intend to suggest that the failure to reconnect the washer was the actual breach of the implied warranty? Does the implied warranty go to every incidental service per-

**9.** The record is silent about the jurors' education, knowledge and experience. The court makes an impermissible fact finding and makes it on a silent record to boot.

formed, regardless of its nature? Assuming Melody Home workmen had done a flawless job repairing the damage caused by the original defect, would the failure to reconnect the washer still be the basis for D.T.P.A. damages? Are there any limits on this new implied warranty?

The court offers additional guidance when it writes: "We do not require service providers to guarantee the *results* of their work; we only require service providers who repair or modify existing tangible goods or property to *perform* those services in a good and workmanlike manner." 741 S.W.2d 354. This explanation, however, is inconsistent with the strict liability analysis which precedes it. If a legal meaning can be attached to the term "warranty", it is as a guarantee to accomplish a result or as a guarantee of the truth of an existing fact. Under products liability the focus is on the character of the product and not the conduct of the manufacturer or distributor. The duty implied at law is that the product sold to the consumer is not unreasonably dangerous, but is suited for its intended purpose. The emphasis in strict liability is on results, not conduct.

So what does the court intend when it states that the implied warranty here goes to performance and not results? Although the court calls it a warranty and supports its creation with strict liability analysis, I suspect that negligence is still the standard by which to measure compliance.

Accompanying every service contract is a promise, either expressed or implied, that the service will be rendered with reasonable care; i.e. that the work will be performed in a diligent and reasonably skillful manner. *Williston, supra* at 1012C. Breach of this implied promise may give rise to a breach of contract action or a tort action for negligence. *Montgomery Ward & Co. v. Scharrenbeck, supra.* The concept of good and workmanlike performance is but an expression of the reasonable care obligation. *Coulson v. Lake LBJ Municipal Utility District,* 734 S.W.2d 649 (Tex. 1987). The court's explanation then that the warranty goes to performance not results seems to indicate that negligence is

still the operative standard when determining whether repair services have been rendered in a good and workmanlike manner. *See Hoffman v. Simplot Aviation, Inc.,* 97 Idaho 32, 539 P.2d 584, 590 (1975) ("Since the case involved the rendition of personal service, a cause of action does not exist for breach of implied warranty in the absence of fault on the part of the actor.") But *see Coulson,* 734 S.W.2d 649, 652 (Spears, J. concurring) ("Negligence ... does not necessarily encompass a breach of the implied warranty of good and workmanlike manner. An engineer could exercise due care, ordinary prudence and perform reasonably but through mistake or ignorance, still render unskilled or shoddy services."). One high court has observed "it is difficult to imagine a 'defect' in a service being something different from the service negligently performed." *Swenson Trucking & Excavating, Inc. v. Truckweld Equipment Co.,* 604 P.2d 1113 (Alaska 1980).

If my interpretation is in error and it is the court's intention to dispense with proof of negligence and extend the strict liability in tort to certain service providers, we are adopting a decidedly minority view. Virtually all efforts to extend strict liability in tort to pure service transactions have been rebuffed. 2 R. Hursh and H. Bailey, *American Law of Products Liability,* § 6:17 (2nd ed. 1974); 5 F. Harper, F. James, Jr., and O. Gray, *The Law of Torts,* Section 28.19(A) (2nd ed. 1986); Sales, *"The Sales–Service Transaction: A Citadel Under Assault,"* 10 St. Mary's L.J. '13, 18–25 (1978). The Restatement also recommends that the conduct of service providers be judged by a negligence standard. *Restatement (2d) of Torts,* § 404 (1965).

Our court has adopted the rule of strict liability in tort as set forth in Section 402(A) of the *Restatement (2d) of Torts.* The Restatement deals specifically and only with the sale of a product. This is not by accident because strict tort liability policy considerations are not easily translated to the sale of services. In fact, there exist a number of countervailing policy considerations against extending strict tort liability to the service provider. The service provider cannot effectively distribute the risk of

loss to consumers. Unlike the mass production of products for distribution to the consuming public, there exists no mass production of services. Services are custom tailored to meet the particular needs of the individual consumer. Consequently, there exists no vast body of distant consumers who are confronted with the difficult burden of tracing and proving unreliable and incompetent workmanship by the service performer. The service transaction emanates from a face to face contractual relationship in which the service consumer seeks a skilled, knowledgeable, and experienced service provider.

The service provider sells skill and time. Time limits the number of consumers that may be serviced. It is unrealistic to suggest that a service provider has the ability to effectively spread the risk among his limited number of customers.

### *Definition*

Further, it is unrealistic to propose a standard definition for what constitutes a good and workmanlike performance. The obligation to perform a job in a good and workmanlike manner requires that the job be completed in a diligent and reasonably skillful manner. Whereas the standard of diligence may be much the same in every contract of employment, whatever its nature, the standard of skill is subject to great variation. Unless the contract contains some definition, the question is one of fact for the jury. It depends not so much upon expert testimony as it does the facts and circumstances surrounding the particular transaction and the reasonable expectations of the consumer. The degree of skill reasonably expected may depend upon such factors as the nature of the job, the amount of compensation, the age and experience of the service provider, and the representations made by the service provider.

The court, however, proposes an objective standard by which to measure the proficiency of the service provided. What I fear the court has done under the name of public policy is convert an otherwise simple contract or negligence claim into an indefinite implied warranty claim which will make every trial involving repair services a battle of conflicting experts.

### CONCLUSION

Limiting the scope of this decision to an extension of the *Humber* warranty makes sense. This court recognized in *Humber* that the purchase of a home is a uniquely important transaction in the life of a consumer. *Humber*, 426 S.W.2d at 561 (quoting *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698, 710 (1966)). Logically, a builder/vendor who attempts to repair a home in order to bring it into compliance with the *Humber* warranty should be required to conform to the same standard of good and workmanlike construction that governed his initial building efforts. The homebuyer's interest—a well-built home—remains the same. Homebuilders can claim no unfair surprise in being held to the same standard of performance in repair efforts as bound them in the initial construction of a home.

Applying the *Humber* warranty to the facts of this case, as suggested in oral argument by the Barneses, does not run afoul of the intended scope of the DTPA. *Humber* was decided law at the time the DTPA was passed. Moreover, there is a certain symmetry to a result under which a defendant who may reduce his *Humber* /DTPA exposure by correcting defects can also increase his exposure by failing to perform in a good and workmanlike manner.

Finally, since this opinion impairs vested substantive rights acquired under existing law, the court's decision should be given prospective application. See: *Holder v. Wood*, 714 S.W.2d 318, 319 (Tex.1986).

HILL, C.J., joins in this concurring opinion.

MAUZY, Justice, concurring.

I concur in all respects with the majority opinion. My only objective in this opinion is to take issue with the concurring opinion.

Both the Senate sponsor and the House sponsor of House Bill 417 wanted to include breach of implied warranties in the

bill when it was being considered by the legislature in 1973. However, the Attorney General of Texas had entered into a political agreement to not include implied warranties in an effort to have the legislature enact a "consensus" bill. I was the Senate sponsor of H.B. 417 and I am well aware of the compromises and political horse trading engaged in by the Attorney General of Texas at the time the bill was passed. I fail to see how those political compromises that were so necessary to achieve a worthwhile result in the legislative process 14 years ago can in any way be construed as "an improper excursion into the legislative arena."

The concurring opinion asks how this case is any different from *Dennis v. Allison*, 698 S.W.2d at 94. The answer to that question is that the makeup of this court has changed. Predictability and stability in our law is not to be maintained at the cost of being wrong. Two wrong decisions do not make a right decision. The simple truth of the matter is that the dissent was right in 1985 and the majority was wrong. The people, speaking through the elective process, have constituted a new majority of this court which has not only the power but the duty to correct the incorrect conclusion arrived at by the then-majority in 1985 on this question. "Law must be stable and yet it cannot stand still." Roscoe Pound, *Interpretations of Legal History 1* (1923).

Finally, not even the author of the concurring opinion can dispute that this court must be amenable to the needs of our citizens. We must be willing to expand or limit the law dependent upon the perceived ills of a changing society. We must also be able to review even the most recent of decisions to determine if the rationales contained therein are still appropriate. Any other policy would be to insure a stasis in the laws of this State and would eventually deny the rights of the people whom we represent. It requires a great deal of intestinal fortitude to overrule decisions as recent as *Dennis v. Allison*, 698 S.W.2d 94 (Tex.1985), and *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392 (Tex.1982). We as a court, however, cannot swerve from our ultimate duty as arbiters of legislative intent. Arguments that seem logical and unassailable in one case are not always applicable or desirable under different facts or after time has passed. So it is today. Our decisions in *Dennis* and *Robichaux* were arguably correct when made, but do not reflect the rights which this court believes merit protection from unwarranted intrusion at this time. To follow the concurring opinion here would only aid those persons who are shoddy and slovenly in their work and would limit the rights of our citizens for redress under the law.

"Cessante Ratione Legis cessat ipsa Lex." (Co.Litt. 70 b.). "Reason is the soul of the law, and when the reason of any particular law ceases, so does the law itself." 7 Rep. 69; per Willes, C.J., *Davis v. Powell*, Willes, 46, cited arg. 8 C.B. 786, (E.C.L.R. 65).

> It is a well settled rule that the law varies with the varying reasons on which it is founded. This is expressed by the maxim, *"cessante ratione, cessat ipsa lex."* This means that no law can survive the reasons on which it is founded. It needs no statute to change it; it abrogates itself. If the reasons on which a law rests are overborne by opposing reasons, which in the progress of society gain a controlling force, the old law, though still good as an abstract principle, and good in its application to some circumstances, must cease to apply as a controlling principle to the new circumstances.

Loomis, J., *Beardsley v. City of Hartford*, 50 Conn. 529, 541 (1883).