# NO. 12-21-00198-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *MICHAEL WAINRIGHT D/B/A WAINRIGHT CONSTRUCTION, APPELLANT* | *§* | *APPEAL FROM THE* |
| *V.* | *§* | *COUNTY COURT AT LAW* |
| *DAVID DELOUCHE, APPELLEE* | *§* | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Michael Wainright d/b/a Wainright Construction ("Wainright") appeals the trial court's judgment awarding damages to David Delouche for breaches of (1) the implied warranty of construction in a good and workmanlike manner and (2) the parties' contract for home construction. In two issues, Wainright challenges the legal and factual sufficiency of the evidence of each breach. We affirm.

## BACKGROUND

Delouche hired Wainright, a general contractor, to build him a 3,000 square foot home on his property near Rusk for $300,000.00. Together, the parties drafted and signed a contract for the project in October 2018. The contract provides the following:

> Wainright Construction to build MR David Delouche a home on his lot and provide all material and labor for Said job and to pass code in his county
>
> All subcontractors required to have License by the state such as plumbing and electrical and heating/cooling and septic will have Said license in order to preform [sic] work on this job
>
> The home will be of metal and wood framing with metal exterior roof and walls and concrete foundation
>
> The interior will be stained floors except in bedrooms this will be a medium grade carpet

The walls will be Sheetrock and the cell will be a combination of Sheetrock and wood

The cabinets will be of stain grade raised panel doors and open shelving where owner requested

The countertops will be of granite of the owners choice not to exceed $45.00 per square foot

All final lighting and plumbing fixtures will be supplied by owner at his cost above the bid of the job

Trim will be of paint grade and stain grade owners [sic] choice

Appliances will be supplied by owner

Insulation will be [] blown in

Windows of low E vinyl color of owners [sic] choice

Exterior doors to be metal with or without glass owners [sic] choice

Home will be all electric except for fireplace and range (if owner chooses)

All interior doors to be hollow-core

Hardware color for all doors will be owners choice .. this cost is in job

Pulls and handles for cabinets will be supplied by owner

All paint and stain colors will be owner choice

Conventional septic/sewer system

2 separtate [sic] a/c units & related equipment

All work will be performed in a timely manner allowing for bad weather

Total cost of job as discussed will be $300,000.00

A deposit of 20 percent-$60,000.00

To begin work will be required and due upon signing contract

Draws accordingly throughout the job not to exceed work performed

Any changes during construction may result in exceeding original bid and should be agreed upon before they are made

In late February 2019, after construction began, Delouche fired Wainright and told him not to return to the property. Delouche hired another contractor to repair alleged defects and finish the project.

Eventually, Delouche sued Wainright, claiming that he breached (1) the implied warranty of construction in a good and workmanlike manner, and (2) the contract by (a) drawing on funds

in excess of the amount of work performed, (b) failing to build the house in accordance with specifications, and (c) failing to adhere to the basic terms of the contract. After a trial on the merits, the court found that Wainright breached the implied warranty and awarded Delouche $13,367.60 for damages incurred for the repair of faulty or substandard work. The court further found that Wainright breached the contract by drawing on funds exceeding the amount of work performed and awarded Delouche $32,378.58 for draws with no corresponding documents or checks. Additionally, the court awarded Delouche $2,946.74 in attorney's fees. This appeal followed.

## EVIDENTIARY SUFFICIENCY

In his first issue, Wainright argues that there is insufficient evidence as a matter of law and fact that he breached the implied warranty of construction in a good and workmanlike manner. In his second issue, he argues that there is insufficient evidence as a matter of law and fact that he breached the contract by failing to account for draws or materials in writing.

### Standard of Review

We sustain a legal sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 821-22. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See id.*

In conducting a factual sufficiency review, we consider and weigh all the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must not merely substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The factfinder is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

**Breach of Implied Warranty**

A builder/vendor impliedly warrants to a purchaser that a building constructed for residential use has been constructed in a good and workmanlike manner. ***Melody Home Mfg. Co. v. Barnes***, 741 S.W.2d 349, 352 (Tex. 1987). "Good and workmanlike" is that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work. ***Id.*** at 354. The focus of a claim of breach of the implied warranty of construction in a good and workmanlike manner is not on the result of the work but on how it was done. ***Id.*** at 355. Expert testimony is sometimes necessary but is not required if the nature of the breach is plainly within the common knowledge of laymen. ***Id.***

On appeal, Wainright contends the evidence that he breached the warranty of construction in a good and workmanlike manner is legally and factually insufficient because Delouche's claims do not match the case law definitions and the contract lacks specifications upon which the claims can rely. He argues that, except for a bow in the carport, Delouche's complaints are about the result rather than the quality of the workmanship. According to Wainright, Delouche's only evidence is "[his] eyes," and his eyes are not a scintilla of evidence of Wainright's failure to construct the home in a good and workmanlike manner. We disagree with these arguments.

At trial, the workmanship evidence was introduced through the testimony of Delouche, Wainright, Clint Glaze, and Johnny Johnson. Glaze replaced Wainright as general contractor when Wainright left the project. He testified that he had twenty-five years of construction experience and owned a construction business for fourteen years. Among the problems he discovered at Delouche's house was "a big sag in the carport area in the roof." The "ridge at—of the roof itself had sank like six inches down and was pushing the beams off of the posts." The issue resulted from a lack of bracing on the rafters, the inclusion of which is standard practice in the trade. If no action was taken to correct the problem, the roof would have collapsed. To correct the problem, Glaze "jacked up the ridgeline and put a cable with turnbuckles tied to each side—each beam and pulled it together, and then we braced—put bracing on the rafters." Delouche paid him $2,461.00 for performing this repair.

Glaze testified that a similar bracing issue existed in the vaulted ceiling in the living room and kitchen. The "trusses were not lined up and sagging towards the center." Glaze did not

4

believe the structure was at risk of collapsing, but if no remedial action was taken, he would not have been able to install the ceiling properly. A bill admitted into evidence shows that he charged Delouche $2,000.00 for "Extra labor in living room vault due to sag in ceiling joist." The bill in its entirety states the following:

Bill for repairs and charges due to other contractor mistakes

Install new front door $500.00

Fix Door jamb on guest end of the house $150.00

Extra labor in pantry due to unlevel walls $600.00

Extra labor in living room vault due to sag in ceiling joist $2,000.00

Total $3,250.00.

Regarding the new front door, Glaze explained that he replaced the door Wainright installed because it had the wrong size door jamb for the wall and did not look right.

Glaze further testified that he found some wiring problems and a misplaced wall at the house. The breaker box was located inside a closet, causing a fire hazard. It was also too far from the meter. This problem was not remedied because the expense to do so was too high. There were also "plugs and light switches that were in the wrong location." Additionally, a wall in the laundry area had to be moved and replumbed and the concrete repaired because the washer and dryer would not fit in the space. Glaze charged Delouche $400.28 for performing these repairs.

Glaze testified about other issues with the house that he did not personally fix. He had an air conditioning installer inspect the air conditioning unit that Wainright supplied. After a discussion with him, Glaze concluded that the unit was oversized for the house and, as a result, installation of a dehumidifier was required to avoid mold growth in the home. Additionally, one of the living room walls caused the kitchen area to have an odd angle but was not moved. Finally, the depth of the closets in the office and two guest bedrooms was too shallow for hanging clothes, and Delouche had to have custom closet rod brackets fabricated to fit the space.

Glaze opined that some of the work done while Wainright was the general contractor was performed in a good and workmanlike manner, but some was not. Regarding the above issues, Glaze "wouldn't have been able to [leave] it that way."

Delouche testified that when Wainright left, there were problems with the walls, roof, closets, doors, windows, electrical work, air conditioning unit, and fireplace. One wall had to be

5

moved to prevent the washer and dryer from protruding into the doorway. Another had to be moved to allow passage between the closets and bed. The kitchen island had to be modified because the electrical outlets in the floor were misplaced. The breaker box was in the closet instead of the utility room. Wainright forgot to install sockets in a couple of the living room walls. He installed front windows so large that they left no room to run electricity for a porch light switch, so the switch had to be installed on the other side of the room. Delouche paid $300.28 to Cherokee Electrical Contractors and $400.28 to Glaze for the electrical repairs.

Delouche identified several issues related to the doors and windows. In the guest bedrooms, "the jambs and all weren't right for the doors, and you could see daylight around them." Furthermore, Wainright ordered front doors that Delouche told him he did not want. Additionally, the front doors and their jamb were built for installation in a wall with 2x4 framing, but the house has 2x6 exterior framing. Delouche subsequently purchased front doors with an appropriately sized jamb at a cost of $2,923.04. Finally, one of the window frames was "offset," which forced Delouche to have the framers "mathematically center" an additional window frame in one of the bedrooms so the house would look right.

Delouche further identified two roof issues. The day after the framers completed the vaulted ceiling area, the roof collapsed. Wainright told Delouche that the framers did not properly brace the roof. They tried to repair it, but a sag remained. The carport roof was also sagging. Delouche paid $2,461.00 to have it raised and braced.

Regarding the dehumidifier, Delouche testified that after Wainright was released, he brought two previously purchased air conditioning units to the house. After a discussion with the air conditioning installer, a determination was made that installing a dehumidifier was necessary because the five-ton unit was too large for the house. The primary concern was that the unit would cool the house so quickly that a high level of humidity would remain and cause mold and other problems. Delouche paid $5,793.00 for the dehumidifier and the installation of it and the two air conditioning units.

Regarding the fireplace, Delouche wanted a brick fireplace and showed Wainright on the house drawing where he wanted it. When the time came to install the fireplace, he was told that he could not have a brick fireplace because no "foot" was constructed in the foundation. Delouche described a "foot" as "where they dig down and put cement to support the weight of a

brick fireplace." Because of this oversight, Delouche was forced to install an insert fireplace rather than a brick one.

Regarding the shallow guest bedroom closets, Delouche was compelled to modify clothes hangers and have custom brackets made to fit the closets. He had thirteen brackets made at $10.00 each. Invoices for a total of eleven brackets were admitted into evidence showing a total cost of $110.00. Delouche had two additional brackets made but did not have an invoice for them. His total cost for repairs on the house was $13,637.60. In Delouche's opinion, Wainright's work was not performed in a good and workmanlike manner.

On cross-examination, Delouche said his opinion that Wainright's work was not performed in a good and workmanlike manner was based on "[his] eyes" and the fact that "[Wainright]'d come up about once a week for about thirty minutes and talk on his phone for about twenty of it and then walk around going 'we got to do this, this, this, this,' jump in his truck, 'I got to go to another job. Bye.'" He did not give Wainright detailed house plans but borrowed drawings from another project to show him the general style and configuration he wanted. No building code applied to the project because the property was located "in the county."

Johnny Johnson testified that he is a general contractor who has been involved in construction work since the 1980s and a salesman for Silver Line Roofing, which originally constructed Delouche's roof. The roof as constructed by Johnson's hands might have caused aesthetic but not structural concerns. Additionally, there was a bow in a strut of the "garage building." The building was structurally sound. The bow was reparable but would have required some effort. On one occasion, Johnson, Delouche, and Wainright were walking through the construction site, and Delouche was asking about "some things that was kind of trashed up." Wainright laughed and said, "If you don't like something, call an inspector and have them look at it." Regarding the location of the breaker box, Delouche wanted it in the closet because he did not want to have to walk very far if something went wrong.

Wainright testified that he had been a carpenter for thirty years, a home builder for twenty-three or twenty-four years, and constructed fifty to seventy-five homes. Regarding several defects alleged by Delouche, Wainright said that the work was performed as Delouche requested. Delouche walked through the construction site with the electrician, the electrician marked the locations where Delouche wanted outlets and light switches, and the outlets and light

switches were installed in those locations. Delouche was not concerned about having a porch light switch by the front doors because the doors would seldom be used. After a discussion with the electrician, it was decided that the breaker box would be installed in the master closet. The guest closets were shallower than standard, but Delouche was not concerned about that fact because he planned to use the closets to store hunting equipment rather than clothes. Delouche went to the building supply store with Wainright and selected the doors he wanted, including the front doors. The disparity between the wall depth and the jamb size could have been cured by installing a jamb extension rather than purchasing new doors. The purchase and installation of a dehumidifier were likewise unnecessary provided the air conditioning units were installed correctly.

Regarding two other alleged defects, Wainright agreed that they were issues but contended that he would have made the repairs if given the chance. The wall in the laundry area was framed incorrectly. The bow in the carport could cause problems, but Wainright told Delouche that he would fix it by installing beams. Wainright was satisfied with all the work done on the house when he was in charge except the work on the carport. However, he would have fixed all Delouche's issues if he finished the project.

Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that supports it, we conclude the evidence would enable reasonable and fair-minded people to find the work on Delouche's house while Wainright was the general contractor was not performed in a manner generally considered proficient by those capable of judging such work. *See* **City of Keller**, 168 S.W.3d at 827. Accordingly, we hold that the evidence is legally sufficient to support the trial court's verdict on Delouche's breach of warranty claim. *See* **id.**

Reviewing the record as a whole, we further conclude that the trial court's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See* **Cain**, 709 S.W.2d at 176. Accordingly, we hold that the evidence is factually sufficient to support the trial court's verdict on Delouche's breach of warranty claim. *See* **id.** Because the evidence is legally and factually sufficient to support the verdict, we overrule Wainright's first issue.

8

**Breach of Contract**

To establish a claim for breach of contract, a plaintiff must prove the following elements: (1) a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 804 (Tex. App.—Houston [14th Dist.] 2019, no pet.). A breach occurs when a party fails or refuses to do something he promised to do. *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Wainright argues that the evidence he breached the contract is insufficient because he had no duty under the contract to (1) "provide written documentation evidencing where the draws were spent," (2) "provide an accounting," or (3) "provide checks or other written documentation upon request." He contends Delouche "is unable to point to a contractual provision that [he] violated." Wainright further argues that "[n]o actual evidence was presented regarding the draws being excessive of the work performed." Finally, he claims that "[i]nstead of pleading and proving a breach, [Delouche] filed suit and asked [him] to prove a negative," constituting an impermissible burden shift. We find these arguments unpersuasive.

The record contains evidence of both a contractual duty and its breach. Although Wainright frames the duty issue as whether he had a duty to provide spending documentation, the issue is whether he had a duty to refrain from making draws exceeding the work performed and materials provided. The contract provision stating, "Draws accordingly throughout job not to exceed work performed," imposes such a duty.

Regarding the breach of that duty, Delouche provided images of six checks he wrote to Wainright Construction for a total of $166,000.00. He testified that he requested during discovery any checks Wainright wrote, invoices, or other proof of payment. In response, Wainright provided nine pages with images of ninety-two checks he wrote, twenty-seven of which he marked with an "x" as relevant to Delouche's job. Eighteen of those checks' memo lines state "David job," "Rusk job," "Rusk house," or "DD job," while three stated "sub," and six were blank. The sum of the check amounts is $133,658.02, which is $32,341.98 less than the draw amount. According to Delouche, Wainright provided no proof of how the remainder was spent. Moreover, Delouche doubted that the checks with blank memo lines or memo lines that stated only "sub" were relevant to his job. The "sub" checks were written to the framing subcontractor, Richard Jones, but dated well after the framing was complete.

9

Wainright and Glaze gave estimates of what percentage of the job was complete when Wainright left. Wainright's estimate was about 50%. Glaze's was 40-50%. Neither estimate correlates with the amount Delouche paid, which is approximately 53.3% of the agreed total cost of the job.[1]

Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that supports it, we conclude that the evidence would enable reasonable and fair-minded people to find that Wainright breached the contract by making draws exceeding the work performed and materials provided. *See City of Keller*, 168 S.W.3d at 827. Accordingly, we hold that the evidence is legally sufficient to support the trial court's verdict on Delouche's breach of contract claim. *See id.*

As is relevant to our factual sufficiency review, Wainright and Johnson provided some contrary evidence through their testimony. Wainright testified that he did not steal money from the job, he paid more money than he drew, and the entire amount drawn was spent on subcontractors and materials. In addition to writing checks, Wainright sometimes paid his subcontractors in cash. After he left the job, Delouche called him asking how much "everyone" was paid. Wainright called "everyone" and requested invoices, which he forwarded to Delouche. An invoice from Enriquez Concrete shows a total charge of $30,552.00, which is $8,948.00 more than the sum of the checks Wainright provided that were written to Antonio Enriquez. An invoice from Richard Jones shows a total charge of $25,000.00, which is $16,220.00 more than the sum of the checks provided that were written to him.

Of the six checks with blank memo lines, five were written to Harry's Building Materials, Harry's Lumber, or Harry's. Wainright testified that he did not buy materials for another job at Harry's in Rusk. The sixth check was written to Johnson, who testified that the check was part of the payment for Delouche's roofing. Johnson also testified that the house was about two-thirds complete when Wainright left and he was shocked when Delouche said he had thus far paid only $166,000.00.

Reviewing the record as a whole, we conclude that the trial court's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Although Wainright's and Johnson's testimony provides some

---

[1] Delouche estimated the job completion at 25-28%. We do not credit his estimate as evidence here because he based it on a calculation involving the amount he paid. Therefore, crediting his estimate would involve circular reasoning.

evidence weighing against the court's finding, the court, as factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See **Golden Eagle Archery**,* 116 S.W.3d at 761. Accordingly, we hold that the evidence is factually sufficient to support the trial court's verdict on Delouche's breach of contract claim. *See id.* Because the evidence is legally and factually sufficient to support the verdict, we overrule Wainright's second issue.

## DISPOSITION

Having overruled Wainright's first and second issues, we ***affirm*** the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered August 24, 2022.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 24, 2022**

**NO. 12-21-00198-CV**

**MICHAEL WAINRIGHT D/B/A WAINRIGHT CONSTRUCTION,**
Appellant
V.
**DAVID DELOUCHE,**
Appellee

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. CV09832)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, all costs of this appeal are assessed against the Appellant, **MICHAEL WAINRIGHT D/B/A WAINRIGHT CONSTRUCTION**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*