James K. **HACKFELD**, Plaintiff,

v.

Kathleen A. **HURREN**, Michael L. **McMullan**, and James R. **Borgstrom**, Defendants,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION—Receiver**, Intervenor.

Civ. A. No. A–89–CA–1087.

United States District Court, W.D. Texas, Austin Division.

June 14, 1991.

Douglas D. Hearne, Jr., Austin, TX, for plaintiff James K. Hackfeld.

Gary E. Zausmer, Wright & Greenhill, and John F. Morehead and Daniel Jordan, Morehead & Jordan, P.C., Austin, TX, for defendant Kathleen A. Hurren.

Michael L. McMullan, pro se.

Gaye Lynn Rothman, Brown, Maroney, Rose, Barber & Dye, Austin, TX, for defendant James R. Borgstrom.

J. Stephen Ravel, Bickerstaff, Heath & Smiley, Austin, TX, and Ann M. Waters, Southern Methodist University, Dallas, TX, for Intervenor F.D.I.C.

## ORDER

SMITH, District Judge.

Five separate motions for summary judgment have been filed with the Court and are being considered together. This controversy arises from a lawsuit filed against two bank officials (Michael L. McMullan and James R. Borgstrom) and the bank's attorney (Kathleen A. Hurren). Each of these Defendants has filed a motion for summary judgment. In addition, the Federal Deposit Insurance Corporation ("FDIC") has intervened and filed a separate motion for summary judgment on the Defendants' behalf. McMullan filed a cross-claim for indemnity against the FDIC, as to which the FDIC has also moved for summary judgment. For the reasons set forth below, this Court grants the Defendants' and FDIC's motions for summary judgment and orders that Plaintiff Hackfeld shall take nothing against Defendants Hurren, Borgstrom, and McMullan, and that McMullan's cross-claim be dismissed.

## I. *Background*

The Plaintiff, James K. Hackfeld, ("Hackfeld"), became a principal of True Fit, Inc. ("True Fit") in September, 1982. In 1987 he became indebted to First RepublicBank South Austin ("First Republic" or the "Bank") (formerly RepublicBank South Austin) as a maker and guarantor of certain debts arising out of business loans made by First Republic to True Fit. The loans were also guaranteed by the other principals, Robert C. Siddons ("Siddons") and Morris K. Gully, Jr. ("Gully"). Part of the collateral securing these loans was one thousand (1,000) shares of stock in Waste Management, Inc. ("Waste Management") some of which were held in a brokerage account by Bear, Stearns & Company ("Bear, Stearns").

On May 13, 1987, after True Fit had experienced financial difficulties, including being placed in an involuntary Chapter 11 bankruptcy, True Fit and First Republic entered into an agreement to renew and extend a promissory note payable by True Fit to the Bank, in the original principal amount of $776,000. This renewal and extension note, personally guaranteed by Hackfeld, matured on September 10, 1987. As of October 1, 1987, True Fit had failed to pay the note in its entirety.

On or about August 27, 1987, as a result of a two for one stock split of Waste Management, First Republic, acting through Defendant James R. Borgstrom ("Borgstrom"), the loan officer in charge of the True Fit loans, requested in writing that Hackfeld deliver 1,000 shares of Waste Management stock to the Bank, pursuant to the terms of Hackfeld's security agreement.

There is conflicting evidence regarding whether Hackfeld agreed or refused to comply with this request. While Hackfeld indicates that he told the Bank the shares would be delivered late, Borgstrom asserts that he thought Hackfeld might remove his assets from the state. In any event, it is undisputed that these shares were not delivered to the Bank until after the Bank commenced its litigation against Hackfeld.

On October 1, 1987, First Republic contacted an attorney, Defendant Kathleen A. Hurren ("Hurren"), in connection with this dispute. Pursuant to the Bank's request, Hurren filed two separate lawsuits against Hackfeld. In the first lawsuit (the "TRO Lawsuit"), the Bank sought and obtained a temporary restraining order against Bear, Stearns. The Bank's second lawsuit was a garnishment action ("Garnishment Lawsuit") against Hackfeld's bank account at Texas Commerce Bank.

The temporary restraining order was issued on October 2, 1987, and served on Bear, Stearns on October 5, 1987. In the Order granting the temporary restraining order, a hearing on the issuance of a temporary injunction was scheduled for October 9, 1987.

Hackfeld became aware of the Garnishment Lawsuit on October 5, 1987, and contacted First Republic on that date. On October 6, 1987, Hackfeld met with officers of the Bank, including Defendant Michael L. McMullan ("McMullan").

An agreement was reached to the effect that the Bank would dismiss both the Garnishment and the TRO Lawsuits in exchange for Hackfeld immediately delivering to the Bank the 1,000 shares of stock resulting from the stock split, as well as grant the bank a security interest in an additional 1,000 shares as collateral for the True Fit indebtedness.

On October 7, 1987, Hackfeld went to Hurren's office to inquire about the dismissal of the lawsuits and the release of the TRO and writ of garnishment. Hackfeld claims that Hurren represented that she was preparing documentation to do so, and that she would obtain the release and advise Texas Commerce Bank and Bear, Stearns. The Garnishment Lawsuit was dismissed on October 7, 1987 and on October 8, 1987, Hackfeld delivered 2,000 shares of Waste Management stock to the Bank. On October 9, 1987, the scheduled temporary injunction hearing was held, which was attended only by Defendant Hurren. No representative of Bear, Stearns or the Plaintiff appeared. Hurren informed the Court that the matter had been settled and the TRO case would be dismissed. Although the TRO expired by operation of law on October 12, 1987, a written order dissolving the temporary restraining order was not signed until October 13, 1987. Hurren orally

notified Bear, Stearns of the dismissal of the TRO. However, Doran Haynie ("Haynie"), an employee of Bear, Stearns, advised Hackfeld that his account would remain frozen until written notice was received. Written notice was sent on October 26, 1987, and received on October 28, 1987, at which time Hackfeld's account was unfrozen.

An unprecedented decline in the stock market occurred on October 16 and 19, 1987. Hackfeld had previously instructed Haynie to sell all of his stock positions except Waste Management in the event the market declined more than 50 points, and to sell the Waste Management stock "short against the box." Because Bear, Stearns refused to unfreeze his account, these requests were not carried out, and Hackfeld suffered a significant financial loss.

In December, 1987, Hackfeld, Siddons, Gully and True Fit filed suit against First Republic. After True Fit's bankruptcy, the suit was removed to the U.S. Bankruptcy Court for the Western District of Texas as an adversary proceeding. In June, 1988, the Bankruptcy Court granted leave for First Republic to file an amended answer and counterclaim to collect on the notes guaranteed by Hackfeld, Siddons and Gully. First Republic was also granted leave to file a third party complaint against Bear, Stearns. In July of that year, First Republic was declared insolvent by the Office of the Comptroller of the Currency, and the FDIC was appointed receiver. All of First Republic's assets were transferred to JRB Bank, a bridge bank, which was subsequently renamed NCNB Texas National Bank ("NCNB") by corporate resolution.

In December, 1988, Hackfeld initiated the present action. Approximately six months later, the True Fit bankruptcy and adversary proceedings were dismissed without prejudice. NCNB then filed a new action against Hackfeld, Siddons and Gully based upon their guaranties of the True Fit notes. The Defendants asserted a counterclaim based

upon the same actions of First Republic in relation to the Bear, Stearns account that are raised in the instant case. The FDIC then intervened and removed both actions to this Court. On October 15, 1990, the parties in the NCNB suit announced settled and the case was dismissed on January 31, 1991.

Hackfeld asserts a number of causes of action against the individual Defendants, including the following: wrongful injunction, tortious interference with a contractual relationship, negligent misrepresentation, breach of contract and violation of the Texas Deceptive Trade Practices Act. ("DTPA").[1] Two basic theories form the basis of Hackfeld's claims: (1) there was no legal or factual basis for the filing of the TRO lawsuit; and (2) Bear, Stearns was not properly notified that the TRO had been dissolved.

## II. *Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to judgment as a matter of law." (Emphasis added.) Rule 56(e) provides that "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing there is a genuine issue for trial." Accordingly, the focus of the Court must be upon disputes of material facts as defined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Where a party moving for summary judgment has established *prima facie* that there is no genuine issue as to any material fact, the non-moving party must then come forward with "specific facts" showing a genuine issue for trial. Such a showing must be

1. Hackfeld has subsequently amended his complaint, without objection to assert causes of action based upon fraud and civil conspiracy. These claims are not addressed in the parties' summary judgment motions, nor in this Court's

present Order. However, the authority upon which the Court relies to deny Plaintiff's additional claims is equally applicable to the fraud and conspiracy claims.

"more than simply ... that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant for summary judgment satisfies its burden by establishing the lack of a material fact issue where it shows that the opposing party is unable to produce evidence in support of an essential element of its claim. *Celotex Corp. v. Caterett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III. *D'Oench, Duhme*

■ The FDIC asserts that Hackfeld's claims against the individual Defendants are precluded by the *D'Oench, Duhme* doctrine, as there is no allegation that these Defendants acted other than in the course and scope of their employment. To support this contention, the FDIC relies upon three cases: *RSR Properties v. FDIC,* 706 F.Supp. 524 (W.D.Tex.1989); *McKibben & Co. v. FDIC,* (No. 4–88–562–K) (N.D.Tex., November 15, 1989); and *Whitehead v. FDIC,* (No. CA–3–89–0973–T) (N.D.Tex., September 13, 1989).

In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the United States Supreme Court held that borrowers are estopped from asserting alleged "secret agreements" with a once-solvent bank as defenses to their liability on notes held by the FDIC or its transferees. The *D'Oench, Duhme* doctrine has been interpreted by subsequent courts to create an irrefutable presumption that the documents in the records of the bank on the date of insolvency represent the true agreement between the parties. *RSR Properties v. FDIC,* 706 F.Supp. at 531.

In *RSR Properties v. FDIC,* the Court extended the *D'Oench, Duhme* protections to officers of failed banks when allegations against them are based upon acts performed within the scope of their employment. In the *RSR Properties* case, the plaintiff, a borrower from a failed bank, sued various bank officers for violations of the Texas DTPA, as well as asserting claims of fraud, tortious interference with contractual relations, and breach of an oral and/or written agreement. Since there was no evidence that the defendants acted outside the course and scope of their employment, and there was no contractual agreement between the plaintiff and the defendants, the Court granted the defendants' motion for summary judgment. To proceed against the bank officers individually, the plaintiff would need to demonstrate that the defendants acted outside the scope of their employment.

In *McKibben & Co. v. FDIC,* the plaintiff sued two bank officials alleging three distinct causes of action: breach of duty of good faith and fair dealing by the defendant bank officers, breach of duty of good faith and fair dealing by the bank, and unconscionable conduct on the part of the defendant bank officers. The Court granted the defendants' motion for summary judgment, concluding that when corporate officers or agents act within the course and scope of their authority, the principal is liable, not the agents.

In a case very similar to the present one, *Whitehead v. FDIC,* the plaintiff/borrower, sued the bank officers of a failed institution alleging breach of contract, breach of duty of good faith and fair dealing, common law fraud and misrepresentation, interference with contractual obligations, and *prima facie* tort. Each of these causes of action revolved around alleged oral representations made by the defendants in their official capacity as bank officers. The defendant bank officers in *Whitehead* argued that since the plaintiff failed to allege that the defendants acted outside the scope of their employment, they were not liable as a matter of law. The plaintiff responded by arguing that the *D'Oench, Duhme* doctrine only prevents borrowers from relying on oral agreements to avoid payment of notes held by the FDIC. Plaintiff further contended that the doctrine does not hold that individual officers and a lending institution cannot be found liable for the deliberate acts of the officers and the lending institution. The Court rejected this argument and concluded that since the defendants had acted within the course and scope of their authority, the plaintiff failed to state a sufficient cause of action. Pursuant to *RSR Properties* and *D'Oench, Duhme,* the Court dismissed the complaint pursuant to

Federal Rule 12(b)(6) for failure to state a claim.

In his response to the FDIC's motion for summary judgment, Plaintiff Hackfeld has set forth several differing theories. First, he argues that *Whitehead* and *McKibben* should be disregarded because of their reliance on *Talmadge Tinsley Co. v. Kerr,* 541 S.W.2d 207 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Hackfeld argues that such reliance is completely out of context since it involves a contract claim rather than a tort claim. Hackfeld totally ignores *RSR Properties,* however, and its use of *Talmadge* in the contact of various tort allegations similar to the case at bar. Moreover, in *Beighley v. FDIC,* 868 F.2d 776 (5th Cir.1989), the Fifth Circuit, in a case involving the borrower's claims for fraud, breach of fiduciary duty, as well as breach of contract, expressly held that the *D'Oench, Duhme* doctrine barred affirmative tort claims against the FDIC. The Court does not find Hackfeld's argument persuasive.

With little authority in support of his proposition, Hackfeld next concludes that since *D'Oench, Duhme* does not bar tort claims against defendant financial institutions, there is no logical reason to extend its protections to agents of those institutions for tort claims and violations of the DTPA. As the courts in *RSR Properties, Whitehead,* and *McKibben* concluded, however, such protections should extend to a bank's agents in the context of alleged wrongful conduct relating to a borrower's activities with the previously solvent bank. *Whitehead* is particularly on point, and the Court finds its reasoning persuasive. Hackfeld's complaint arises from an alleged oral agreement on October 6, 1987, that the bank would notify Bear, Stearns about the dismissal of the TRO lawsuit. This is exactly the kind of oral agreement which cannot be enforced against the failed bank or its successors under the *D'Oench, Duhme* doctrine.

Since Hackfeld clearly admits that Hurren, McMullan, and Borgstrom were acting within the course and scope of their employment with the bank, their alleged oral misrepresentations are protected under the doctrine of *D'Oench, Duhme.* Even assuming *arguendo,* that Hackfeld had a legitimate cause of action against the bank, he cannot now attempt to make an end run around the *D'Oench, Duhme* doctrine by suing the bank officers and the attorney.

While the Court is persuaded that *D'Oench, Duhme* precludes the Plaintiff's claims, the summary judgment proof presented further establishes that these claims have no basis in law or fact.

## IV. *Hurren's Motion for Summary Judgment*

■ Hurren first argues that Hackfeld has no valid breach of contract action against her since there is a complete absence of privity between Hackfeld and her. While Hackfeld denies this allegation in his Response to Hurren's Motion, he provides no legal or factual support for such a conclusion. Moreover, in his general reply brief, he does not even address the breach of contract issue. Since Hackfeld has failed to meet his burden in response to Hurren's allegation, summary judgment should be granted to Hurren on the breach of contract action.

■ Hurren also argues that Hackfeld's DTPA cause of action is meritless since Hackfeld does not qualify as a consumer under the act. In order to prove consumer status under the DTPA, the plaintiff must show (1) that he or she sought or acquired goods or services by purchase or lease; and (2) the goods or services purchased or leased must form the basis of the complaint. *Melody Homes Manufacturing v. Barnes,* 741 S.W.2d 349 (Tex.1987). Moreover, in *Knight v. International Harvester Credit Corporation,* 627 S.W.2d 382 (Tex.1982), the Texas Supreme Court expanded the DTPA cause of action against parties who sought to enjoy the benefits of the sale. While there is no doubt that Hackfeld sought and acquired services from Bear, Stearns, there is no evidence that Hurren sought to enjoy the benefits of these transactions between Hackfeld and Bear, Stearns.

While Hackfeld correctly points out that the Texas Supreme Court extended the *Knight* holding in *Flenniken v. Longview Bank & Trust,* 661 S.W.2d 705 (Tex.1983), such an extension is irrelevant to the case at bar. In that case, the Court held that a

plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant. The only requirement is that the goods or services sought or acquired by the consumer form the basis of the complaint. In *Flenniken* the basis of the complaint was the builder's failure to complete the house. In those circumstances, the bank was found liable for wrongfully foreclosing. The services sought in this case are those of Bear, Stearns. These services form no basis of the complaint. Rather, Hackfeld's complaint is based upon the alleged wrongdoings of the insolvent bank, its officers and attorney. There is no alleged underlying wrongdoing against the brokerage firm. Therefore, as a matter of law, Hackfeld is not a consumer under the DTPA, and Hurren's motion for summary judgment on that issue should be granted.

■ Hurren next argues that she is not properly a defendant to Hackfeld's claim of wrongful injunction. In essence, she states that even if the injunction was wrongful, only the party seeking the injunction (i.e., the insolvent bank) can be held liable, and not the attorney representing the applicant. In *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984), the Texas Supreme Court held that an attorney's assertion of colorable legal rights, particularly in the context of an actual or threatened lawsuit, is privileged even if the party asserting those rights was ultimately mistaken about the strength of its claim. Therefore, Hurren's actions were privileged and her motion for summary judgment should be granted accordingly.

Hurren further contends that Hackfeld cannot recover against her on the theory of tortious interference because her actions were legally justified, were privileged, and were performed in her capacity as agent for the bank and not on her own behalf. As stated above, the Texas Supreme Court in *Steck* noted that "it would be a strange doctrine indeed to hold that a person having a well grounded and justified belief of a right in or to property may be liable in damages because of the assertion of such a right." *Steck,* quoting *Tidal Western Oil Corp. v. Shackelford,* 297 S.W. 279 (Tex.Civ.App.—

Fort Worth 1927, writ ref'd). Since Hurren was acting pursuant to her contractual obligations with the bank, she should not be found personally liable for such actions. Therefore, her motion for summary judgment as to the tortious interference cause of action should also be granted.

## V. Borgstrom's Motion for Summary Judgment

Against Borgstrom, Hackfeld has also alleged wrongful injunction, tortious interference with a contractual relationship, and violation of the Texas Deceptive Trade Practices Act.

■ Hackfeld's allegations against Borgstrom are meritless and the discussion in regard to Defendant Hurren's motion is equally applicable here. As stated previously, the insolvent bank is the only potential wrongdoer in this case and Plaintiff has settled and dismissed all claims he might have against the Bank. The activities of Borgstrom were clearly in good faith and he is privileged from suit for wrongful injunction or interference with a contractual relationship. Since Hackfeld is not a consumer within the meaning of the DTPA, that cause of action should fail as well. Therefore, Borgstrom's Motion for Summary Judgment should be granted on these grounds independent of the *D'Oench, Duhme* doctrine.

## VI. McMullan's Motion for Summary Judgment

Against McMullan, Hackfeld has alleged negligent misrepresentation and violation of the Texas Deceptive Trade Practices Act. McMullen has filed a Motion for Summary Judgment pro se. For the reasons set forth in Parts III and IV above, McMullan's Motion for Summary Judgment is granted. In particular, the *D'Oench, Duhme* doctrine precludes this lawsuit against the bank officials acting in their official capacity. Moreover, Hackfeld is not a consumer within the meaning set forth in the DTPA and the cases interpreting it.

### VII. *FDIC's Motion for Summary Judgment as to Cross–Claim*

The cross-claim by McMullan against the FDIC is now rendered moot by the above disposition of the merits of this case. Therefore, such cross-claim is dismissed and the FDIC's Motion for summary judgment need not be resolved.

### VIII. *Conclusion*

For the reasons set forth above, the Defendants' Motions for Summary Judgment are hereby in all respects **GRANTED,** and Plaintiff Hackfeld shall take nothing against Defendants Hurren, Borgstrom, and McMullan in this lawsuit.

**IT IS FURTHER ORDERED** that Plaintiff shall bear all costs of court.