# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00170-CV

**Bernard John Horak, Appellant**

**v.**

**Warren Newman and Ruth Newman, Appellees**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
## NO. 20,084, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Bernard John Horak, a self-employed home builder doing business as Horak Construction ("Horak"), appeals the trial court's judgment in favor of appellees Warren Newman and Ruth Newman, concerning Horak's construction and repair of the Newmans' residence. In thirteen points of error, Horak challenges the sufficiency of the evidence to support the Newmans' claims of breach of contract, breach of warranty, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act[1] and the award of damages. Horak also contends that limitations barred the Newmans' claims of breach of contract and DTPA violations. For the reasons that follow, we affirm the trial court's judgment.

---

[1] *See* Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp. 2008) (the "DTPA").

**FACTUAL AND PROCEDURAL BACKGROUND**

Horak and the Newmans entered into a contract in October 1993 for Horak to construct the Newmans' residence from architectural plans that the Newmans submitted to Horak.[2] Among the contract's terms, Horak agreed "to furnish the materials and perform the labor necessary for the completion of 2800 SQ FT Residence. . . . All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of [ ] $217,700." One of the features of the residence was a room off the master suite with a bathtub that had a "glass" ceiling and a "zero overhang" roofline.[3] The architect's plans and specifications did not provide "flashing detail"[4] for this feature.

The Newmans moved into the residence in October 1994 before Horak had completed construction. In their first night staying in the residence, an unattached water line flooded the kitchen, living area, a guest bedroom, and the floor vents for one of the three heating and air-conditioning ("HVAC") systems in the residence. Around this time, the Newmans also observed

---

[2] The parties agree that a document titled "PROPOSAL" was the contract between the parties.

[3] In his briefing to this Court, Horak describes this room as "a rectangular, predominately glass, enclosure which extends out from the master suite" and the "zero overhang feature" as a design that "is more liable to leak than would a more conventional design." We refer to the room as the "tub room" as the parties do.

[4] According to testimony at trial, flashing is "typically . . . referred to . . . as membranes such as sheet metal flashings that go above windows, door pan flashings that go underneath doors, . . . or any condition that requires a membrane or sheet metal or other type of flashing to insure a water tight product."

that the residence was "sweating."[5]   Horak repaired the damage from the flooding, including replacing tiles in January 1995.  At the time the tiles were replaced, standing water was discovered in the HVAC ducts in the "crawl" space underneath the house.  Horak, through his plumbing subcontractor Wayne's Air Control, repaired the ducts.  They did not replace the ducts but drained the water by disconnecting the ducts, drying them out, and then reconnecting them.

In January 1995, the Newmans experienced their "first real rain" in the residence and "sheets of water came into the tub area."[6]  Horak undertook repairs to the tub room by replacing sections of plexiglass roofing panels with "tempered glass."   Horak finished the residence's construction and repairs in 1995, and the Newmans were unaware of any further flooding, leaks, or "sweating" in the residence.

Beginning in 1995, the Newmans hired Wayne's Air Control to service their HVAC systems each year.  As part of its service in May 1999, a technician from Wayne's Air Control discovered mold and mildew in the ducts located underneath the house that had been repaired in 1995.  The Newmans hired Wayne's Air Control to repair and replace the contaminated ducts at a cost of $2,765.00.  Around the same time, the Newmans hired a contractor to do some painting at their residence, and the contractor discovered "rotting" in the interior of the walls in the tub room. The Newmans hired Classic Constructors to repair the water damage in the tub room at a cost of $5,901.71.

---

[5] At trial, Mrs. Newman testified:  "In the November/December [1994] time frame the house was sweating, the windows were sweating.  You know, they were just covered in condensation."

[6] In his briefing to this Court, Horak states that "[i]n January 1995, after a heavy rain, water was observed leaking in large amounts" into the tub room.

Beginning in 1999, through counsel, the Newmans provided written notices to Horak of their claims of defective construction and repair and corresponding injuries concerning the ducts and the tub room. The parties were unable to resolve the dispute informally, and the Newmans filed suit in April 2000, alleging claims for breach of contract, breach of warranty, and DTPA violations arising from Horak's construction and repairs. The Newmans sought damages, statutory additional damages, and attorney's fees.

The case was tried to the court in March 2003. The Newmans' witnesses included Mr. Newman; Mrs. Newman; Wayne Roark, the owner of Wayne's Air Control; Shawn Solsbery, the owner of Classic Constructors; and the Newmans' attorney. Mrs. Newman testified to their agreement with Horak, the construction of the residence, the flooding from the unattached water line the first night that they stayed in the residence, the "sheets of water" that came into the tub room when they had their "first real rain," their belief that the respective repairs had addressed the water intrusion problems, their subsequent discovery of interior "rotting" in the tub room walls and mold in the ducts in 1999, and the repairs that were performed in 1999 to address these problems. Mr. Newman testified to his communications with Horak, including representations that Horak made after the repairs were completed in 1995 that Horak had "taken care of everything" and the repairs were complete.[7] Roark and Solsbery testified to their respective observations of the residence prior

---

[7] During direct examination, Mr. Newman testified:

Q.    And I just want to ask you a few questions. I'm taking you back to January, February 1995 when you closed on your house. Prior to closing, did Mr. Horak ever represent to you that he had repaired the damage from the plumbing defect which pertained to the plumbing and air conditioning system?

to undertaking repairs, the repairs that their companies performed, and the costs associated with their repairs. The Newmans' attorney testified to their incurred attorney's fees.

Horak's witnesses included Horak and Ken Cleveland, a builder in the construction business. Horak testified to his agreement with the Newmans, the construction of the residence, and to the repairs that he undertook to the ducts and the tub room in 1995. During cross-examination, he testified that he did not make a settlement offer to the Newmans in response to their demand

A.     Yes. Our main concern was that there had been damage to the system at the time. That was our only concern. And Mr. Horak said, yes, I've had the contractor out and I've taken care of everything.

Q.     And you spoke to him personally?

A.     Yes.

Q.     With regard to the problems with the leaking in the tub room structure, did you discuss with him prior to closing whether or not those problems had been taken care of?

A.     I can't tell you whether it was he or his assistant, David Hilliard, who made the final representation that they were assured that everything was taken care of.

Q.     But Horak Construction represented to you that the work had been done and that the roof would no longer leak?

A.     Right.

Q.     Or the structure would no longer leak?

A.     Right.

During cross-examination, Mr. Newman also testified that he inspected the ducts when the water was discovered and after the repairs were completed in 1995 and that Horak represented that the duct repair was "all fixed."

letters and answered "Yes" when asked if he "represented to Mr. Newman that the water leakage problems pertaining to the tub area were repaired." Cleveland testified to his observations of the residence in 1999 around the time Classic Constructors was performing repairs to the tub room. Neither party designated a construction expert.

The trial court rendered judgment on December 21, 2004, in the Newmans' favor on their claims of breach of contract, breach of warranty, DTPA violations, and exemplary damages. The trial court awarded damages of $8,666.71, statutory additional damages of $10,000.00, attorney's fees of $9,250.00, costs, and interest. The trial court did not make findings of fact and conclusions of law.[8] This appeal followed.

## ANALYSIS

Horak raises thirteen points of error. In his first and seventh points of error, Horak contends that the applicable statutes of limitations barred the Newmans' breach of contract and DTPA claims. In his remaining points of error, he challenges the legal and factual sufficiency of the evidence to support the trial court's judgment in favor of the Newmans on all of their claims and the damages awarded. Because Horak's points of error challenging the Newmans' breach of warranty claims and the damages awarded are dispositive, we limit our review to these points of error. *See* Tex. R. App. P. 47.1.[9]

---

[8] Horak requested findings of fact and conclusions of law from the trial court, but he did not file a notice that the trial court's findings of fact and conclusions of law were past due. *See* Tex. R. Civ. P. 296, 297.

[9] We do not address Horak's points of error concerning the Newmans' claims of breach of contract and DTPA violations based on "laundry list" items and unconscionability. *See* Tex. Bus. & Com. Code Ann. §§ 17.46, .50 (West Supp. 2008). These unaddressed points of error include:

***Standard of Review***

Horak challenges the legal and factual sufficiency of the evidence to support the trial court's judgment. When the trial court does not make findings of fact or conclusions of law in a case tried to the court, as is the case here, all facts necessary to support the trial court's judgment and supported by the evidence are implied in favor of the trial court's judgment. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We apply the same standard of review to legal and factual sufficiency challenges of a trial court's implied findings as we apply to the review of jury findings. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83-84 (Tex. 1992); *Roberson v. Roberson*, 768 S.W.2d 280, 281 (Tex. 1989).

A legal sufficiency challenge may be sustained when the record discloses one of the following situations:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact.

---

(i) as part of his first and seventh points of error, Horak contends that the Newmans' breach of contract claims were barred by limitations; (ii) in his third and ninth points of error, he contends that the evidence was legally and factually insufficient to support the Newmans' breach of contract claims; and (iii) as part of his fourth and tenth points of error, he challenges the legal and factual sufficiency of the evidence to support the Newmans' "laundry list" and unconscionability claims brought under the DTPA.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, "*No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). When reviewing a finding for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 807. When considering a factual sufficiency challenge, the reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In a case tried to the court, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id*. at 697.

### *Limitations*

As part of his first and seventh points of error, Horak contends that the Newmans' breach of warranty claims brought under the DTPA were barred by the DTPA's two-year statute of limitations. *See* Tex. Bus. & Com. Code Ann. § 17.565 (West 2002) (claims brought under the DTPA must be commenced within two years).[10] Horak urges that the Newmans' claims arise

---

[10] Section 17.565 of the DTPA reads:

All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or

8

from events that occurred prior to February 1995, there was no testimony of water intrusion after January 1995, the Newmans did not bring suit until 2000, and there was no evidence or, alternatively, insufficient evidence that the defects were undiscoverable or that the Newmans exercised reasonable diligence in discovering the defects.

The Newmans respond that Horak must prove the date the "mold set in or the rot began" to prove Newmans' claims were time barred. Alternatively, they rely on the discovery rule exception in section 17.565 of the DTPA to contend that their claims were not barred. *See id.*; *see also Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001) ("The discovery rule exception operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim."); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) (same). When a plaintiff knew or should have known of an injury generally presents a question of fact. *Cadle Co. v. Wilson*, 136 S.W.3d 345, 352 (Tex. App.—Austin 2004, no pet.).

Assuming without deciding that the Newmans' breach of warranty claims under the DTPA would be barred unless the discovery rule exception applies, we imply a finding by the trial court that the Newmans discovered or, in the exercise of reasonable diligence, should have discovered the facts giving rise to their breach of warranty claims in 1999, and we review the sufficiency of the evidence to support this implied finding. *See City of Keller*, 168 S.W.3d at 810; *BMC Software*, 83 S.W.3d at 795; *Cain*, 709 S.W.2d at 176.

---

deceptive act or practice.

Tex. Bus. & Com. Code Ann. § 17.565 (West 2002).

Evidence concerning the mold claim that is favorable to the implied finding includes the testimony of Mrs. Newman, Roark, and Mr. Newman. Mrs. Newman testified that the Newmans hired Wayne's Air Control to maintain and inspect their residence's HVAC systems from 1995 forward, Wayne's Air Control did not discover the mold until 1999, and the HVAC systems worked and she was unaware of flooding or "sweating" in the residence after the 1995 repair. Roark testified consistently that the Newmans hired his company to do "preventive maintenance inspection" and that, as part of the inspection in May 1999, a new technician who "took it upon his own to go a little deeper into it than most service techs" discovered the mold. Roark further testified that the mold was not visible without going underneath the house with a flashlight. Mr. Newman testified that he looked at the ducts shortly after they had been re-connected in 1995, they looked like they had before the flooding, and Horak represented to him that the repairs were complete. Photographs of the crawl space and ducts underneath the residence that were taken prior to the flooding in October 1994 also were admitted into evidence.

Evidence concerning the water damage in the tub room favorable to the implied finding includes Solsbery's testimony that the water damage to the interior of the walls was not visible before the painter removed the exterior siding in 1999:

Q.      Was the damage that you repaired visible to the naked eye without going in and tearing out a wall?

A.      When I got there, it was, simply because the painter had removed two pieces of siding, as I recall. But I believe prior to that, it is my understanding that it was not visible and became an issue once the house was being repainted. And this was discovered by the painter.

10

Mrs. Newman testified consistently that the painting contractor discovered the "rotting" in the interior of the walls in the tub room in 1999 that she was able to see "after the wall was pulled off." Mrs. Newman also testified that she was unaware of further leaks in the tub room after Horak undertook the repairs in 1995, and photographs of the water damage were admitted into evidence.

Horak contends that the Newmans failed to show "reasonable diligence" because the evidence showed that the area underneath the residence was accessible from the garage, mold or mildew on at least one of the three HVAC systems was visible externally, and the Newmans did not conduct their own personal inspections after 1995. Horak also questions the credibility of the witnesses that testified to the discovery of the water damage in the tub room. But, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See McGalliard*, 722 S.W.2d at 696. Considering all the evidence, we cannot conclude that an implied finding that the Newmans exercised reasonable diligence is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176.

We conclude that the evidence was legally and factually sufficient to support an implied finding that the Newmans first discovered or, in the exercise of reasonable diligence, should have discovered the facts giving rise to their breach of warranty claims in 1999. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176. The Newmans' claims, brought in 2000, therefore, were not barred by limitations. *See* Tex. Bus. & Com. Code Ann. § 17.565. We overrule Horak's first and seventh points of error to the extent the points of error address the Newmans' breach of warranty claims under the DTPA.

*Breach of Warranty*

In his second and eighth points of error and as part of his fourth and tenth points of error, Horak challenges the legal and factual sufficiency of the evidence to support the trial court's judgment in the Newmans' favor on their breach of warranty claims.

      1)     *Residential Construction Liability Act*

As an initial matter, Horak contends that the Newmans' breach of warranty claims are governed by Chapter 27 of the property code, the Residential Construction Liability Act ("RCLA"). *See* Tex. Prop. Code Ann. §§ 27.001-.007 (West 2000 & Supp. 2008). The RCLA modifies causes of action for damages resulting from construction defects in residences by limiting and controlling causes of action that otherwise exist. *See Gentry v. Squires Constr., Inc.*, 188 S.W.3d 396, 405 (Tex. App.—Dallas 2006, no pet.). The RCLA does not create a cause of action, but provides defenses, limitations on damages, and determines the standard of causation. *Id*. at 404. The limitations on damages do not apply if the contractor fails to make a reasonable offer of settlement or repair. *See* Tex. Prop. Code Ann. § 27.004(f) (West Supp. 2008);[11] *Perry Homes v. Alwattari*, 33 S.W.3d 376, 383-84 (Tex. App.—Fort Worth 2000, pet. denied) (when contractor

---

[11] The legislature amended section 27.004 of the RCLA in 1999, 2003, and 2007. *See* Act of May 24, 1999, 76th Leg., R.S., ch. 189, § 5, 1999 Tex. Gen. Laws 663, 665-66 (amending Tex. Prop. Code Ann. § 27.004); Act of June 1, 2003, 78th Leg., R.S., ch. 458, § 2.04, 2003 Tex. Gen. Laws 1703, 1724-27 (same); Act of June 15, 2007, 80th Leg., R.S., ch. 843, § 3, 2007 Tex. Gen. Laws 1752, 1753 (same). Although we recognize that the parties' dispute was subject to the prior law, the amendments do not affect our analysis of the issues before us. For convenience, we cite to the current version of the property code.

fails to make reasonable settlement offer, limitations of statute as to both type and amount of damages are inapplicable).

In this case, it was undisputed that Horak did not make an offer of settlement in response to the Newmans' demand letters.  *See* Tex. Prop. Code Ann. § 27.004(f); *Perry Homes*, 33 S.W.3d at 383-84.  Because Horak did not make a settlement offer, the RCLA limitations on damages do not apply to the Newmans' claims.  *See* Tex. Prop. Code Ann. § 27.004(f).  We, therefore, analyze Horak's evidentiary challenges to the Newmans' breach of warranty claims pursuant to the common law and the DTPA.

### 2)      Sufficiency of the Evidence

Horak does not dispute that he warranted that the construction and subsequent repairs to the Newmans' residence would be performed in a good and workmanlike manner.[12]  *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987) (Texas courts recognize implied warranty to repair or modify existing tangible goods or property in good and workmanlike manner, defining good and workmanlike as "performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work").  He argues that the evidence failed to show that he did not build the Newmans' residence in a good and workmanlike manner or that there was a causal nexus between his construction and repairs in 1995 and the mold and water

---

[12]  In the contract between the parties, Horak agreed that "[a]ll material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner."

13

damage in 1999. He contends that the only evidence was that he built the residence according to the architect's plans and specifications, and that the injuries were a result of problems with the plans and specifications and not defective construction. He further relies on the lack of expert testimony to prove causation.

Horak's evidentiary challenges to the Newmans' causation evidence for both their breach of warranty claims and their DTPA claims based on breach of warranty are to the causation-in-fact component of causation. *See Mack Trucks v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006) (causation-in-fact is common element to both proximate and producing cause); *see also* Tex. Bus. & Com. Code Ann. § 17.50(a)(2) (West Supp. 2008) (liability for DTPA violation of breach of warranty requires showing of producing cause);[13] *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999) (liability for breach of warranty requires "showing of proximate cause").[14] Causation-in-fact requires that "the defendant's conduct or product be a substantial factor in bringing about the injuries in question." *See Mack Trucks*, 206 S.W.3d at 582.

---

[13] Section 17.50(a)(2) of the DTPA reads:

(a)     A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:

* * *

(2)     breach of an express or implied warranty; . . . .

Tex. Bus. & Com. Code Ann. § 17.50(a)(2) (West Supp. 2008). The DTPA does not define or create warranties. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995). Warranties actionable under the DTPA must first be recognized by common law or created by statute. *Id.*

[14] Proximate and producing cause differ in that foreseeability is an element of proximate cause but not of producing cause. *See General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993).

Because Horak does not dispute that he warranted the construction and repairs of the residence, we imply a finding by the trial court that Horak breached a warranty that was a substantial factor in bringing about the Newmans' injuries and review the sufficiency of the evidence to support the implied finding. *See City of Keller*, 168 S.W.3d at 810; *BMC Software*, 83 S.W.3d at 795; *Cain*, 709 S.W.2d at 176.

### a) Mold in the ducts

Evidence favorable to the implied finding as to the mold claim includes the undisputed evidence that (i) an unattached water line that was defectively installed[15] "flooded" the residence's kitchen, living area, and a guest room in October 1994, (ii) Horak undertook repairs in 1995 to remove the standing water from the flooding in the ducts underneath the residence that did not include replacing the ducts, and (iii) no additional flooding occurred and the HVAC systems worked in the residence after the 1995 repair.

Roark provided evidence of the 1995 repair to the ducts. He testified that his company was an original subcontractor for Horak on the Newmans' residence and to the plumbing incident in 1995:

Q. And please tell the Court what you recall about that incident.

A. Well, I believe that Barney, or Mr. Horak, had called me personally about checking and inspecting some duct work, that the outlets all came through the floor so the water leak let the water get into the outlets. And I asked him if he wanted me to replace them. He said, well, just look at the situation, if we

---

[15] In his briefing to this Court, Horak identified the plumbing subcontractor "whose faulty installation of that line had caused the problem."

can salvage them, we'll salvage them by taking them loose and let them drain the water out of them.

Q.    As opposed to replacing them. Okay. So did you go under the house and do the draining?

A.    My men and I did, yes.

* * *

Q.    Now, let me ask you this. When you drained these air ducts, did you take a towel or something and get in there and dry the air ducts?

A.    No, ma'am. Basically, what we did was we took them loose, the ones that had water in them, we put the fans on [the] on position to blow air through there. That's how we felt to dry it best.

When asked "how much water was in these ducts," Roark testified: "I think it was enough to pull one duct loose from the register box, the outlet box where the air goes into the floor of the house. So quite a bit of water in one of them." He estimated a "gallon, maybe, of water." He testified that he drained "three, four maybe." He testified that there were three HVAC systems and "one was affected more than the other two"—the system pertaining to the living area.

Roark testified to available measures to combat mold and mildew and further testified that if all of the water was not drained out of the ducts, mold and mildew would be the normal result:

Q.    And when you first arrived on the scene of this damage in '95, was your—observe what you saw as far as the water damage to the ducts, was your initial impression that the ducts problem should be changed out, replaced?

A.    Well, under—that's kind of a tough question. Sometimes when you put air conditioning duct in new construction houses, they'll get wet. You don't change out all the ducts. I think that's just kind of an—I don't know what to

16

tell you. But I figured if—you know, we were busy and I figured if we could get all the water out, that that would be good enough.

Q.     And if you can't, what is normally the result?

A.     Well, if you have excess of water or moisture, you've got mold and mildew that takes place.

Q.     And is that something that you see in your line of work?

A.     Yes, ma'am.

Q.     And are there special substances to combat that?

A.     Yes, ma'am.

Q.     What type of substances are out there?

A.     Well, you have a killer for—a sterilizer and treat the air, treat the coil and the ducts. And a duct cleaning system that you can go through.

Horak contends that there was no causal nexus between the events in 1995 and 1999 because the evidence showed mold and mildew were discovered in all three HVAC systems and that it is common to have mold and mildew even without flooding. But Roark testified during cross-examination that he found mildew and "a little bit of mold" in the other two HVAC systems in 1999 but the main one with mold was the one that was "affected by the water." Mrs. Newman also testified that she was only aware of the single flooding event in the residence in October 1994.

From the evidence, the trial court could have inferred that moisture remained in the ducts after the 1995 repair, Horak did not repair the ducts in a good and workmanlike manner, and the inadequate repair was a substantial factor in bringing about the mold. *See Mack Trucks*, 206 S.W.3d at 582. We conclude that the evidence was legally and factually sufficient to support

17

a finding that Horak breached a warranty that was a substantial factor in bringing about the mold in the ducts. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### b) *Water damage in the tub room*

Evidence favorable to the implied finding as to the tub room includes Mrs. Newman's testimony that "sheets" of water came into the tub room when the Newmans had their first "real rain" and that she was unaware of any further leaks after Horak's repairs in 1995, Horak's testimony that he undertook repairs to the tub room in the early part of 1995 by replacing sections of plexiglass roofing panels with tempered glass, Solsbery's testimony of the water damage that he observed, Cleveland's testimony concerning the zero overhang feature, and photographs admitted into evidence of (i) the water damage in the tub room, (ii) materials that Classic Constructors removed and hauled off, and (iii) Classic Constructor's repair process.[16]

Horak contends that there was no competent evidence of proper construction standards, deviation from those standards, or any causal nexus between any such deviation and the damages claims, and that there was no competent evidence to establish the duration of, or location of, the water penetration to the tub room in 1995. He contends that the evidence showed that he followed the architect's plans and specifications and that he repaired the tub room at his own expense to fix problems with the architect's plans. He also contends that the evidence shows, more likely than not, that the leak was from the "plexiglass" ceiling and that there was no evidence that

---

[16] Horak states in his briefing to this Court: "Between the date of occupancy and February 1, 1995, . . . leaks in a glass ceiling resulted in water intrusion into the bath area of the master suite."

18

a vapor barrier would have prevented water intrusion. But Solsbery and Cleveland testified to a builder's responsibilities when constructing a zero overhang design; Cleveland specifically addressed the feasibility of a "vapor barrier" and testified that exposure to moisture causes "rotting" in wood; and Horak testified that the architect's plans left it up to him to take care of the "flashing detail" and he did not install a "vapor barrier."

Horak testified to his construction of the zero overhang feature and repairs in 1995 because of the water intrusion problems in the tub room:

Q. The Plexiglas did what, sir?

A. The Plexiglas moved during the heat and wouldn't nothing stay caulked or sealed. So I called my glass, my mirror man, a guy that does that, and he told me that we should put laminated glass. He said, in the first place, Plexiglas didn't meet building code because it was overhead. So we put the laminated glass there and it doesn't move. Then that stopped it. But the plans don't have a flashing detail and all—you can look at right here and see that.

Q. And if the plans don't have a flashing detail, it's at your discretion as the builder to decide what kind of flashing detail to use; isn't that true?

A. If they don't have a flashing detail, you have to waterproof it. But they may caulk after you do that, as long as nothing moves.

Q. So you have the option on whether to caulk or flashing or any other method. That's a choice that you make?

A. Just so it don't leak.

\* \* \*

Q. The plans did specify a zero overhang design on that particular area of the house [the tub room], didn't it?

A. Yes.

19

Q.    So you knew going in there that moisture barriers, moisture problems was something that had to be addressed specifically because of that design, didn't you?

A.    Yes.  Well, moisture problems have to be applied to any style house.

Q.    Exactly.  Doesn't matter what the design is, they all have their own questions. And that's up to the contractor to take care of those questions as they arise. And you didn't do anything for the tub room to protect against moisture inside the walls, did you?

A.    If you have a zero overhang, that's all you can do, put gutters on it.

Q.    Sir, isn't it true that you could put different types of flashings on it depending on the necessity?

A.    Well, we did the flashings.

Q.    You could put moisture barriers inside the walls?

A.    That's not going to do anything.  That's like a vapor barrier.  It can warp and get on either side of it.  Like I told you, we built the house according to code.

Horak testified that he could not "recollect" what "flashing" he installed and that there was no guidance in the plans about how to do the connection of the tub room to the main wall of the residence.  He answered "Yes" when asked if it was up to him to make a decision on the connection and testified that he did not include a vapor barrier, either initially or at the time of the repair.

Solsbery testified to a contractor's considerations with a zero overhang feature:

Q.    With a zero overhang, as a contractor, what are some of the specifications that you have to deal with as far as the integrity of the joint of the wall to the roof?

A.    I think whenever you have a zero overhang, it complicates the situation.  The more overhang we have, the more protected our structures are.  So without a[n] overhang, a lot of careful detailing, complex detailing comes into play.

20

Solsbery further testified to the damage that he observed. He testified the damage to the tub room was "rot due to water intrusion," including "damage below the window, . . . damage to the dimensional lumber as well as to the truss below. There's also damage to the [interior material]." He testified that the interior material "appeared to have damage from bulk water intrusion. It was decaying and I believe rotting in places." As part of the 1999 repair, he testified that "[a] vapor barrier was installed" to "prevent the structure from seeing the type of water intrusion it had." He also testified that he did not remember seeing a vapor barrier prior to the 1999 repair and that the lack of one contributed to the moisture problem.[17]

Cleveland, who testified on behalf of Horak, testified to his observations of the Newmans' house around the time that Solsbery was undertaking repairs, his observations of the cause of the water damage in the tub room, and the actions a builder should take to prevent water intrusion when faced with a zero overhang feature. He testified during his direct examination:

Q.      Is that [a zero overhang] a structural device or a structural item that can cause water penetration?

A.      Yes, sir, it can.

Q.      Is it very common to have water penetration with zero overhang?

---

[17] Solsbery testified:

Q.      With regard to vapor barrier and flashings, did you observe anything during your reparation of this structure that contributed to the moisture problem?

A.      I believe, as I stated earlier in my testimony, we did not see a vapor barrier installed around this portion of the structure. . . .

21

A.    Yes, sir, it is.

Q.    Based upon your observations of the Newmans' house and the zero overhang that was built out there, do you think that's what caused the water penetration?

A.    That is what I would say caused the water penetration, yes.

Cleveland testified further during cross-examination:

Q.    Continuing along that line, [is] there anything a builder can do in connection with building a zero overhang house to prevent water from penetrating?

A.    What I would say a builder would need to do to prevent such a problem would be not to use wood, to use some other type of material that would not be subjected to rot.

Q.    What about flashing or any other sort of vapor barrier, would that prevent this problem?

A.     If it were properly sealed, it could.  Again, if the wood is exposed—if you can't get the water—keep the water off the wood, you're inviting wood rot.

* * *

Q.    There's nothing in these plans that would have prevented Mr. Horak from putting flashing around the windows?

A.    Not that I can see.

Q.    There's nothing in these plans that would have prevented Mr. Horak from putting in some sort of vapor barrier or water barrier in the construction to prevent water from coming in around the windows?

A.    From the outside, the only way I could see that you could prevent it from coming in would be some type of barrier. In this case it might be paint because it has the wood on the exterior of the house.

22

Q.    You could put a vapor barrier underneath the exterior paneling before—exterior wood and before you get to the frame; is that correct?

A.    On the—under the trim you mean?

Q.    Yes.

A.    Yes, sir.

Q.    And there's nothing in here that would have prevented Mr. Horak from doing that?

A.    Well, with the exception that it would have covered up some of the wood veneer.  That's the best I can tell on this.

Q.    Now, in constructing a house with this sort of zero roof line, zero overhang design, I mean, a reasonably proficient builder would know that there's a risk of water coming in; is that correct?

A.    Anytime you have exposed wood, you're going to have that risk.  But, yes, with a zero overhang, you do increase your risk of water coming in.

Q.    And that's a risk that should be obvious to a builder?

A.    Yes, sir.

Q.    In constructing a house with a zero roof line like that, a builder should take extra precautions to make sure the water doesn't enter around the windows; is that correct?

A.    He should do everything possible, yes.

Q.    And you have no knowledge of anything that Mr. Horak did to prevent water from coming in around the windows; isn't that correct?

A.    There's no way I can know that.

From the evidence, the trial court could have inferred that Horak did not construct and/or repair the tub room in a good and workmanlike manner to prevent water intrusion, and

23

Horak's inadequate construction and/or repairs were a substantial factor in causing the rot and decay from the water intrusion. *See Mack Trucks*, 206 S.W.3d at 582. We conclude that the evidence was legally and factually sufficient to support a finding that Horak breached a warranty that was a substantial factor in bringing about the water damage in the tub room. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### c) *Expert testimony*

Horak contends the Newmans' proof failed without expert testimony of causation. Whether expert testimony was necessary is a question of law that we review *de novo*. *See Mack Trucks*, 206 S.W.3d at 583. Expert testimony is required on "matters beyond jurors' common understanding." *See id.* ("Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding."). Lay witness testimony, however, may establish causation when "a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation." *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984); *see also* Tex. R. Evid. 701;[18] *Guevara v. Ferrer*, 247 S.W.3d 662,

---

[18] Texas Rule of Evidence 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

668 (Tex. 2007) ("[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.").

Here, the parties did not designate construction experts, but the Newmans offered testimony from skilled witnesses that included their personal observations and conclusions as to the cause of the Newmans' injuries. *See* Tex. R. Evid. 701. That the failure to adequately remove water and moisture when repairing a residence for water intrusion problems would breach the warranty of good and workmanlike construction and/or repair and that the breach would be a substantial factor in bringing about mold and water damage is not a matter beyond jurors' common understanding. *See McGalliard*, 722 S.W.2d at 697 (subject of house repairs is not "one for experts or skilled witnesses alone"); *see also Melody Homes*, 741 S.W.2d at 355 (breach of implied warranty was "plainly within the common knowledge of laymen and did not require expert testimony"; factfinder had "sufficient knowledge to find that the failure to connect a washing machine drain would not be considered good and workmanlike by those capable of judging repair work").

On this record, we conclude that the Newmans' proof of causation without expert testimony, but inclusive of testimony from skilled witnesses with personal knowledge, was

---

Tex. R. Evid. 701.

25

sufficient. We overrule Horak's second and eighth points of error and his fourth and tenth points of error to the extent the points of error address the Newmans' breach of warranty claims under the DTPA.

***Damages***

In his fifth, sixth, eleventh, twelfth, and thirteenth points of error, Horak challenges the legal and factually sufficiency of the evidence to support the trial court's award of damages, statutory additional damages, and attorney's fees. We address each of the challenged awards in turn.

### 1) *Reasonableness of damages*

The trial court awarded the Newmans $8,666.71 "as the principal amount due." This amount equals $2,765.00, the amount the Newmans paid to Wayne's Air Control to repair mold in the ducts, and $5,901.71, the amount the Newmans paid to Classic Constructors to repair the water damage in the tub room. Horak contends that the trial court erred in this award because there was no evidence or, alternatively, insufficient evidence to support a finding that the repair costs that the Newmans incurred in 1999 were reasonable. *See Perry Homes*, 33 S.W.3d at 385 ("To recover out-of-pocket expenses or costs paid for repairs, [the plaintiffs] were required to prove the amounts paid were both reasonable and necessary."). We imply a finding by the trial court then that the incurred costs to repair the ducts and the tub room were reasonable and review the legal and factual sufficiency of the evidence to support this finding. *See City of Keller*, 168 S.W.3d at 810; *BMC Software*, 83 S.W.3d at 795; *Cain*, 709 S.W.2d at 176.

26

Evidence favorable to the implied finding includes the testimony of Roark and Solsbery. Roark testified to the amount that his company charged and the repairs that his company performed in 1999. The invoice, admitted into evidence, includes a "Description of work done":

> Remove contaminated ducting from system (EPA disposal), clean evaporator, blower assembly, drain pan & line. Apply antimicrobiale spray to interior of new ducting (supply & return). Apply fungistat to interior of AHU 2 & 3. Install new ducting as per deim. Reseal all joints (double seal). Treat system #1 with antimicrobiale/fungistat (system shows no contaminate). Run test system & Ck for air leaks (OK).

The invoice includes an itemization of the "Parts Charges" of $1,490.00 and the "Labor Charges" of $1,275.00. The invoice shows the quantities of the parts purchased and 47 hours of labor for the repair.

Solsbery similarly testified concerning his company's estimated costs and the repairs to the tub room that his company performed in 1999. Solsbery testified that they "only replaced that material that was excessively damaged" and "absolutely necessary." He testified that "it could have developed into a larger scale project," but that they "were trying to keep the cost low" and their intention in repairs was "to simply stabilize the existing structure." The estimate and the final invoice with itemized charges were also introduced into evidence. The estimated total cost was

27

$6,630.00 and the final invoice's total was $5,901.71. The estimate and final invoice provide a description of the charges with their corresponding costs.[19]

Horak contends that the Newmans' evidence was limited to the amounts that they paid for the repairs and that the record is "silent as to whether those amounts were reasonable" and, citing to *Perry Homes*, without such evidence the "award of damages for costs of repairs fails." *See* 33 S.W.3d at 385. The evidence as detailed above, however, does not support Horak's contentions and is distinct from the evidence presented by the homeowners in *Perry Homes*. In that

---

[19] The final invoice reads in pertinent part:

| Description | Amount |
|---|---|
| Tear Out / Re-frame - Everett Construction | 2,242.00 |
| Plexi Glass Roof & Window Replacement - MF Glass & Mirror | 1,078.00 |
| Lumber Package | 1,088.09 |
| Front Door Repair | 160.00 |
| Disposal | 350.00 |
| Subtotal | 4,918.09 |
| 20% Builder's Fee | 983.62 |
| Total | $5,901.71 |

The estimate reads in pertinent part:

| Description | Total |
|---|---|
| Tear out & remove siding, rotten framing, glass panels | 675.00 |
| Haul off/ Disposal | 400.00 |
| Re-frame/ Sheath | 1,450.00 |
| Siding/ Trim | 1,100.00 |
| Plexi Glass Roof | 950.00 |
| Paint prep & prime | 650.00 |
| Exterior Painting | 300.00 |
| Subtotal | 5,525.00 |
| 20% Builder's Fee | 1,105.00 |
| Total | $6,630.00 |

28

case, our sister court found no evidence to support the jury's finding that the home repair costs were reasonable, but the only testimony of the lump sum expense for each repair was from the plaintiffs' son. *See id.* In contrast, here, the owners of the companies that undertook the repairs testified and provided an itemization of their charges. As our sister court recognized, it is not necessary for a witness to use the words "reasonable" and "necessary" to recover costs of repair, and "a claimant need only present sufficient evidence to justify a [fact finder]'s finding that the costs were reasonable and the repairs necessary." *Id.* (quoting *Ebby Halliday Real Estate, Inc. v. Murnan*, 916 S.W.2d 585, 589 (Tex. App.—Fort Worth 1996, writ denied)); *see also 2 Fat Guys Inv., Inc. v. Klaver*, 928 S.W.2d 268, 273 (Tex. App.—San Antonio 1996, no writ) (bill and receipt of car repair "objective valuation of the services provided from which the jury could infer that the amounts paid represent reasonable costs for repairing appellee's car"); *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 694 (Tex. App.—Austin 1989, no writ) ("objective estimate" some evidence from which jury could infer that amount "represents a reasonable cost to repair").

We conclude that the evidence was legally and factually sufficient to support an implied finding that the Newmans' costs to repair the ducts and the tub room were reasonable. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### 2) *Statutory additional damages*

The trial court awarded the Newmans statutory additional damages of $10,000.00, an amount within the statutory limit of three times the amount of damages the trial court awarded.

*See* Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (West Supp. 2008).[20] Horak contends that the trial court erred in awarding statutory additional damages because there was no evidence or, alternatively, insufficient evidence to support the element of "knowingly" under the DTPA.

Section 17.45(9) of the DTPA defines "knowingly":

(9)     "Knowingly" means actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim or, in an action brought under Subdivision (2) of Subsection (a) of Section 17.50, actual awareness of the act, practice, condition, defect, or failure constituting the breach of warranty, but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

*Id*. § 17.45(9) (West Supp. 2008); *see also St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 54 (Tex. 1998) ("actual awareness" means that "a person knows that what he is doing is false, deceptive, or unfair"); *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239, 242 (Tex. 1985) (evidence supported "knowing" violation when there was "evidence from which the jury

---

[20] Section 17.50(b)(1) of the DTPA reads:

In a suit filed under this section, each consumer who prevails may obtain:

(1)     the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages; . . .

Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (West Supp. 2008).

30

could have inferred that [the builder] knew that the house was defective at the time of construction"). Applying the statutory definition, we imply a finding by the trial court that Horak had "actual awareness" of the "act, practice, condition, defect, or failure" constituting breach of warranty and review the sufficiency of the evidence to support this finding. *See City of Keller*, 168 S.W.3d at 810; *BMC Software*, 83 S.W.3d at 795; *Cain*, 709 S.W.2d at 176.

Roark, who was working as Horak's subcontractor at the time of the 1995 repairs to the ducts, testified that they "were busy and I figured if we could get all the water out, that would be good enough," and that, if water remained, the result would be "mold and mildew." Horak, through his subcontractor, drained and dried the ducts and did not replace them or further treat them. As to the repairs to the tub room, Cleveland, the builder that testified on Horak's behalf, answered "Yes, sir" when asked if it should be "obvious" to a builder that a zero overhang increases the risk of water intrusion, and he testified that a builder "should do everything possible" when asked if a builder should take extra precautions to make sure the water does not enter around the windows when "constructing a house with a zero roof line."

As detailed above regarding the Newmans' breach of warranty claims, Horak testified that he was aware of moisture problems with a zero overhang, he did not include a "vapor barrier," either initially or at the time of the repair, and he could not "recollect" what "flashing" was installed. He also testified that there was no guidance in the architect's plans about how to do the connection of the tub room to the main wall of the residence, but he answered "Yes" when asked if it was up to him to make a decision on the connection. Mr. Newman also testified that Horak told him that he "had taken care of everything" after undertaking the repairs in the tub room in 1995.

31

The evidence supports an inference that Horak had "actual awareness" of an "act, practice, condition, defect, or failure" constituting breach of warranty. *See* Tex. Bus. & Com. Code Ann. § 17.45(9). We conclude that the evidence was legally and factually sufficient to support a finding of "knowingly" and the statutory additional damages awarded. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### 3) Attorney's fees

The trial court awarded attorney's fees of $9,250.00. Horak does not challenge the amount of the award but contends that the trial court erred in awarding attorney's fees because the Newmans failed to prevail on any claims before the court. Because we have concluded that the evidence was legally and factually sufficient to support a finding that Horak violated the DTPA, we conclude that the trial court did not err in awarding attorney's fees to the Newmans pursuant to the DTPA. *See* Tex. Bus. & Com. Code Ann. § 17.50(d) (West Supp. 2008) ("Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees.").

We overrule Horak's fifth, sixth, eleventh, twelfth, and thirteenth points of error challenging the trial court's award of damages, statutory additional damages, and attorney's fees.

## CONCLUSION

Because we conclude that the Newmans' warranty claims under the DTPA were not barred by limitations and that the evidence was legally and factually sufficient to support the Newmans' breach of warranty claims and the damages awarded, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 21, 2009

33